# UNITED STATES *v.* CONTINENTAL CAN CO. ET AL.

No. 367.  Argued April 28, 1964.—Decided June 22, 1964.

442

*Ralph S. Spritzer* argued the cause for the United States. On the brief were *Solicitor General Cox, Assistant Attorney General Orrick, Lionel Kestenbaum* and *Arthur J. Murphy, Jr.*

*Helmer R. Johnson* argued the cause for appellees. With him on the brief was *Mark F. Hughes.*

MR. JUSTICE WHITE delivered the opinion of the Court.

In 1956, Continental Can Company, the Nation's second largest producer of metal containers, acquired all of the assets, business and good will of Hazel-Atlas Glass Company, the Nation's third largest producer of glass containers, in exchange for 999,140 shares of Continental's common stock and the assumption by Continental of all the liabilities of Hazel-Atlas. The Government brought this action seeking a judgment that the acquisition violated § 7 of the Clayton Act[1] and requesting an

---

[1] Section 7 of the Clayton Act, 38 Stat. 731, as amended by the Celler-Kefauver Antimerger Act, 64 Stat. 1125, 15 U. S. C. § 18, provides in relevant part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of com-

appropriate divestiture order. Trying the case without a jury, the District Court found that the Government had failed to prove reasonable probability of anticompetitive effect in any line of commerce, and accordingly dismissed the complaint at the close of the Government's case. *United States* v. *Continental Can Co.,* 217 F. Supp. 761 (D. C. S. D. N. Y.). We noted probable jurisdiction to consider the specialized problems incident to the application of § 7 to interindustry mergers and acquisitions.[2] 375 U. S. 893. We reverse the decision of the District Court.

## I.

The industries with which this case is principally concerned are, as found by the trial court, the metal can industry, the glass container industry and the plastic container industry, each producing one basic type of container made of metal, glass, and plastic, respectively.

Continental Can is a New York corporation organized in 1913 to acquire all the assets of three metal container

merce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

[2] Both parties and the District Court refer to this as an interindustry merger. The word "industry" is susceptible of more than one meaning. It might be defined in terms of end uses for which various products compete; so defined it would be roughly equivalent to the concept of a "line of commerce." According to this interpretation the glass and metal container businesses, to the extent they compete, are in the same industry. On the other hand, "industry" might also denote an aggregate of enterprises employing similar production and marketing facilities and producing products having markedly similar characteristics. In many instances, the segments of economic endeavor embraced by these two concepts of "industry" will be substantially coextensive, since those who employ the same types of machinery to turn out the same general product often compete in the same market. Since this is not such a case it will be helpful to use the word "industry" as referring to similarity of production facilities and products. So viewed, "interindustry competition" becomes a meaningful concept.

manufacturers. Since 1913 Continental has acquired 21 domestic metal container companies as well as numerous others engaged in the packaging business, including producers of flexible packaging; a manufacturer of polyethylene bottles and similar plastic containers; 14 producers of paper containers and paperboard; four companies making closures for glass containers; and one—Hazel-Atlas—producing glass containers. In 1955, the year prior to the present merger, Continental, with assets of $382 million, was the second largest company in the metal container field, shipping approximately 33% of all such containers sold in the United States. It and the largest producer, American Can Company, accounted for approximately 71% of all metal container shipments. National Can Company, the third largest, shipped approximately 5%, with the remaining 24% of the market being divided among 75 to 90 other firms.[3]

During 1956, Continental acquired not only the Hazel-Atlas Company but also Robert Gair Company, Inc.—a leading manufacturer of paper and paperboard products—and White Cap Company—a leading producer of vacuum-type metal closures for glass food containers—so that Continental's assets rose from $382 million in 1955

---

[3] The District Court found that the basic raw material used in the manufacture of cans, and the major cost factor bearing on their price is tin-coated steel (tin plate). In some instances uncoated steel (blackplate) or aluminum is used instead of tin plate. Other raw materials include soldering compounds, paints, varnishes, lithographic inks, paper and cartons for packaging. Cans are rigid and unbreakable, can be hermetically sealed and are impermeable to gases. They are lighter than glass containers, can be heat-processed faster, and are not chemically inert.

Forty-nine members of the metal can industry are organized in a trade association known as the Can Manufacturers Institute which maintains a professional staff of three. Acting largely through committees, it deals with various technical problems of the industry and carries out some promotional activities emphasizing the advantages of the metal can.

to more than $633 million in 1956, and its net sales and operating revenues during that time increased from $666 million to more than $1 billion.

Hazel-Atlas was a West Virginia corporation which in 1955 had net sales in excess of $79 million and assets of more than $37 million. Prior to the absorption of Hazel-Atlas into Continental the pattern of dominance among a few firms in the glass container industry was similar to that which prevailed in the metal container field. Hazel-Atlas, with approximately 9.6% of the glass container shipments in 1955, was third. Owens-Illinois Glass Company had 34.2% and Anchor-Hocking Glass Company 11.6%, with the remaining 44.6% being divided among at least 39 other firms.[4]

After an initial attempt to prevent the merger under a 1950 consent decree failed, the terms of the decree being

---

[4] According to the findings of the District Court, glass containers are made principally from sand, lime, and soda ash, and the major factor in determining their price is the cost of labor. Glass containers are rigid, breakable, and chemically inert. They can be hermetically sealed and, unlike many cans, can be easily resealed after they have been opened. The industry recognizes two basic types of containers, the wide mouth and the narrow neck. Members of this industry also have a trade association, the Glass Container Manufacturers Institute, which, through its 45 employees and its standing committees, carries on such activities as market research and promotion, technical research, package design and specifications, the development of standard testing and quality control procedures, problems of freight rates, labor relations, and liaison work with government. In recent decades the expansion of the glass container industry has been more rapid than, and often realized at the expense of, the metal can industry. During World War II, for example, substantial increments in the market served by glass container manufacturers were made possible by the short supply of tin plate.

The third industry found by the District Court to be involved in this multi-industry competitive picture was the plastic container industry, which, though a relative newcomer, has enjoyed impressive growth since making its debut in the mid-1940's. Its dollar sales volume is small compared with that of its metal and glass counterparts, but its growth has been and continues to be steady and rapid.

held inapplicable to the proposed acquisition, the Government moved for a preliminary injunction against its consummation and sought a temporary restraining order pending the determination of its motion. The temporary restraining order was denied, and on the same day the merger was accomplished. The Government then withdrew its motion for a preliminary injunction and continued the action as one for divestiture.

At the conclusion of the Government's case, Continental moved for dismissal of the complaint. After the District Court had granted the motion under Rule 41 (b) of the Federal Rules of Civil Procedure but before a formal opinion was filed, this Court handed down its decision in *Brown Shoe Co.* v. *United States,* 370 U. S. 294; additional briefs directed to the applicability of *Brown Shoe* were filed. The trial judge held that under the guidelines laid down by *Brown Shoe* the Government had not established its right to relief under § 7 of the Clayton Act. This appeal followed.

## II.

We deal first with the relevant market. It is not disputed here, and the District Court held, that the geographical market is the entire United States. As for the product market, the court found, as was conceded by the parties, that the can industry and the glass container industry were relevant lines of commerce. Beyond these two product markets, however, the Government urged the recognition of various other lines of commerce, some of them defined in terms of the end uses for which tin and glass containers were in substantial competition. These end-use claims were containers for the beer industry, containers for the soft drink industry, containers for the canning industry, containers for the toiletry and cosmetic industry, containers for the medicine and health industry, and containers for the household and chemical industry. 217 F. Supp., at 778–779.

The court, in dealing with these claims, recognized that there was interindustry competition and made findings as to its extent and nature:

"[T]here was substantial and vigorous inter-industry competition between these three industries and between various of the products which they manufactured. Metal can, glass container and plastic container manufacturers were each seeking to enlarge their sales to the thousands of packers of hundreds of varieties of food, chemical, toiletry and industrial products, ranging from ripe olives to fruit juices to tuna fish to smoked tongue; from maple syrup to pet food to coffee; from embalming fluid to floor wax to nail polish to aspirin to veterinary supplies, to take examples at random.

"Each industry and each of the manufacturers within it was seeking to improve their products so that they would appeal to new customers or hold old ones." 217 F. Supp., at 780–781.

Furthermore the court found that:

"Hazel-Atlas and Continental were part of this overall industrial pattern, each in a recognized separate industry producing distinct products but engaged in inter-industry competition for the favor of various end users of their products." *Id.*, at 781.

The court, nevertheless, with one exception—containers for beer—rejected the Government's claim that existing competition between metal and glass containers had resulted in the end-use product markets urged by the Government: "The fact that there is inter-industry or inter-product competition between metal, glass and plastic containers is not determinative of the metes and bounds of a relevant product market." *Ibid.* In the trial court's view, the Government failed to make "appropriate distinctions . . . between inter-industry or overall com-

modity competition and the type of competition between products with reasonable interchangeability of use and cross-elasticity of demand which has Clayton Act significance." *Id.,* at 781–782. The interindustry competition, concededly present, did not remove this merger from the category of the conglomerate combination, "in which one company in two separate industries combined with another in a third industry for the purpose of establishing a diversified line of products." *Id.,* at 782.

We cannot accept this conclusion. The District Court's findings having established the existence of three product markets—metal containers, glass containers and metal and glass beer containers—the disputed issue on which that court erred is whether the admitted competition between metal and glass containers for uses other than packaging beer was of the type and quality deserving of § 7 protection and therefore the basis for defining a relevant product market. In resolving this issue we are instructed on the one hand that "[f]or every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range." *Times-Picayune* v. *United States,* 345 U. S. 594, 612, n. 31. On the other hand it is improper "to require that products be fungible to be considered in the relevant market." *United States* v. *du Pont,* 351 U. S. 377, 394. In defining the product market between these terminal extremes, we must recognize meaningful competition where it is found to exist. Though the "outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," there may be "within this broad market, well-defined submarkets . . . which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 325. Concededly these guidelines offer no precise formula for judgment and they necessitate, rather than avoid, careful consideration based upon the entire record.

It is quite true that glass and metal containers have different characteristics which may disqualify one or the other, at least in their present form, from this or that particular use; that the machinery necessary to pack in glass is different from that employed when cans are used; that a particular user of cans or glass may pack in only one or the other container and does not shift back and forth from day to day as price and other factors might make desirable; and that the competition between metal and glass containers is different from the competition between the can companies themselves or between the products of the different glass companies. These are relevant and important considerations but they are not sufficient to obscure the competitive relationships which this record so compellingly reveals.

Baby food was at one time packed entirely in metal cans. Hazel-Atlas played a significant role in inducing the shift to glass as the dominant container by designing "what has become the typical baby food jar." According to Continental's estimate, 80% of the Nation's baby food now moves in glass containers. Continental has not been satisfied with this contemporary dominance by glass, however, and has made intensive efforts to increase its share of the business at the expense of glass. In 1954, two years before the merger, the Director of Market Research and Promotion for the Glass Container Manufacturers Institute concluded, largely on the basis of Continental's efforts to secure more baby food business, that "the can industry is beginning to fight back more aggressively in this field where it is losing ground to glass." In cooperation with some of the baby food companies Continental carried out what it called a Baby Food Depth Survey in New York and Los Angeles to discover specific reasons for the preference of glass-packed baby food. Largely in response to this and other in-depth surveys, advertising campaigns were conducted which were de-

signed to overcome mothers' prejudices against metal containers.[5]

In the soft drink business, a field which has been, and is, predominantly glass territory, the court recognized that the metal can industry had "[a]fter considerable initial difficulty . . . developed a can strong enough to resist the pressures generated by carbonated beverages" and "made strenuous efforts to promote the use of metal cans for carbonated beverages as against glass bottles." 217 F. Supp., at 798. Continental has been a major factor in this rivalry. It studied the results of market tests to determine the extent to which metal cans could "penetrate this tremendous market," and its advertising has centered around the advantages of cans over glass as soft drink containers, emphasizing such features as convenience in stacking and storing, freedom from breakage and lower distribution costs resulting from the lighter weight of cans.

The District Court found that "[a]lthough at one time almost all packaged beer was sold in bottles, in a relatively short period the beer can made great headway and may well have become the dominant beer container." 217 F. Supp., at 795. Regardless of which industry may have the upper hand at a given moment, however, an

---

[5] In 1952 Continental ran a series of advertisements emphasizing the following "5 reasons why cans are an ideal container for baby foods:"

"1. ECONOMICAL. Baby food in cans is usually priced as low or lower than baby food packed in other containers.

"2. STERILE. Processing sterilizes the inside, and light, dust and germs can't get into a hermetically sealed can.

"3. EXTRA SAFETY. Cans are sealed to stay sealed until the consumer opens them.

"4. SHATTERPROOF. Steel and tin won't break, shatter or chip.

"5. SAFE FOR LEFT-OVERS. Food can be safely left in the can, just keep it covered and under refrigeration."

intense competitive battle on behalf of the beer can and the beer bottle is being waged both by the industry trade associations and by individual container manufacturers, one of the principal protagonists being Continental. Technological development has been an important weapon in this battle. A significant factor in the growth of the beer can appears to have been its no-return feature. The glass industry responded with the development of a lighter and cheaper one-way bottle.

In the food canning, toiletry and cosmetic, medicine and health, and household and chemical industries the existence of vigorous competition was also recognized below. In the case of food it was noted that one type of container has supplanted the other in the packing of some products and that in some instances similar products are packaged in two or more different types of containers. In the other industries "glass container, plastic container and metal container manufacturers are each seeking to promote their lines of containers at the expense of other lines, . . . all are attempting to improve their products or to develop new ones so as to have a wider customer appeal," 217 F. Supp., at 804, the result being that "manufacturers from time to time may shift a product from one type of container to another." *Id.*, at 805.

In the light of this record and these findings, we think the District Court employed an unduly narrow construction of the "competition" protected by § 7 and of "reasonable interchangeability of use or the cross-elasticity of demand" in judging the facts of this case. We reject the opinion below insofar as it holds that these terms as used in the statute or in *Brown Shoe* were intended to limit the competition protected by § 7 to competition between identical products, to the kind of competition which exists, for example, between the metal containers of one company and those of another, or between the several manufacturers of glass containers. Certainly, that

the competition here involved may be called "inter-industry competition" and is between products with distinctive characteristics does not automatically remove it from the reach of § 7.

Interchangeability of use and cross-elasticity of demand are not to be used to obscure competition but to "recognize competition where, in fact, competition exists." *Brown Shoe Co.* v. *United States,* 370 U. S., at 326. In our view there is and has been a rather general confrontation between metal and glass containers and competition between them for the same end uses which is insistent, continuous, effective and quantitywise very substantial. Metal has replaced glass and glass has replaced metal as the leading container for some important uses; both are used for other purposes; each is trying to expand its share of the market at the expense of the other; [6] and each is attempting to preempt for itself every use for which its product is physically suitable, even though some such uses have traditionally been regarded as the exclusive domain of the competing industry.[7] In differing degrees

---

[6] Consumer preferences for glass or metal are often regional and traceable to factors other than the intrinsic superiority of the preferred container. For example, the one-way beer bottle was highly successful in Baltimore—due in part to the efforts of "a highly motivated leading brewer"—but failed to make headway in Detroit. And though glass appears to have about 80% of the Nation's baby food business, as of the time of the merger cans had over 60% of the business west of the Mississippi. According to one opinion in the record, all Canadian baby food moves in cans. And an official of the Glass Container Manufacturers Institute reported to that body that pickles, preserves, and jams are packed in tin cans in Canada.

[7] Ford Sammis & Company, a firm of market economists, conducted for the Glass Container Manufacturers Institute market surveys of 28 different product classifications. On the basis of over 3¼ million individual answers to questions asked in more than 12,000 personal interviews, Ford Sammis concluded the following:

"Every consumer product tends to standardize on a single type of container. Glass has become the standard, traditional container for

for different end uses manufacturers in each industry take into consideration the price of the containers of the opposing industry in formulating their own pricing

---

a host of products, including catsup, salad dressings, salad oil, instant coffee, prune juice, mayonnaise, peanut butter, jams and syrup. Other products have standardized on tin cans—regular coffee, evaporated milk, dog food, and most fruits, vegetables and juices.

"However, no traditional market is ever secure for any type of container. Marketers are apt to try out new containers at any time, in their constant search for ways to increase sales.

"When this happens, the result is a period of container competition, which may run through one or more of three separate stages."

1. Stage 1, according to the Sammis report, occurs when a new type of container is first introduced by a secondary brand. Thus "[a] new container can become a potent sales force for a brand, if strong consumer preference exists (or is promoted) for that type of container. Recognizing this, secondary brands are constantly trying out new types of containers as sales incentive. While leading brands are ordinarily satisfied to maintain the status quo, secondary brands are willing to gamble to improve their positions."

2. The second stage comes about in this manner: "If a secondary brand increases its sales during the period when it is introducing a new type of container, the sales increase is usually attributed to the new container, by marketer and competitors alike. Advertising, product changes or other factors may actually be more important than the new container, but circumstantial evidence points to the container.

"Leading brands are not prone to sit idly by while competitors cut into their share of the market. They tend to cover competitors' bets by offering both traditional and new types of containers to their customers. This creates Stage 2 of container competition."

3. "When leading brands are available in a choice of containers, consumers' container preference is no longer in conflict with their brand preferences. They can have the brand they want in the container they want. Sales of leading brands under these circumstances seek the level of consumer preference for each type of container.

"If preference for one type of container greatly exceeds preference for the other type, the products then tends [sic] eventually to standardize once again on a single type of container—the container most

policy.[8]   Thus, though the interchangeability of use may not be so complete and the cross-elasticity of demand not so immediate as in the case of most intraindustry mergers, there is over the long run the kind of customer response to innovation and other competitive stimuli that brings the competition between these two industries within § 7's competition-preserving proscriptions.

Moreover, price is only one factor in a user's choice between one container or the other.   That there are price differentials between the two products or that the demand for one is not particularly or immediately responsive to changes in the price of the other are relevant matters but not determinative of the product market issue. Whether a packager will use glass or cans may depend not only on the price of the package but also upon other equally important considerations.   The consumer, for example, may begin to prefer one type of container over the other and the manufacturer of baby food cans may therefore find that his problem is the housewife rather

consumers prefer.   This process is subject to promotion of container by brand marketers or container manufacturers.   The alternate outcome can be favorable to either the new or the traditional container."

[8] The chairman of the board of Owens-Illinois Glass Co. testified that he takes into account the price of metal containers in pricing glass containers for beer, soft drinks, and household and chemical products, and to a lesser degree for toiletries and cosmetics.   In assessing the likelihood that it could "penetrate [the] tremendous market" for soft drink containers Continental concluded "[a]ssuming that the merchandising factors are favorable and that the product quality is well received, the upper limit on market acceptance will then be determined by *price.*"   Continental also stated in an intercompany memordandum that in the fight between the beer can and the one-way bottle "[t]he key factor, in our estimation, is *pricing,*" and concluded that a reduction in the price of one-way beer bottles was to "be regarded as a further attempt on the part of the glass manufacturers to maintain their position in the one-way package field."

than the packer or the price of his cans.[9]  This may not be price competition but it is nevertheless meaningful competition between interchangeable containers.

We therefore conclude that the area of effective competition between the metal and glass container industry is far broader than that of containers for beer.  It is true that the record in this case does not identify with particularity all end uses for which competition exists and all those for which competition may be non-existent, too remote, or too ephemeral to warrant § 7 application.  Nor does the record furnish the exact quantitative share of the relevant market which is enjoyed by the individual participating can and glass companies.  But "[t]he 'market,' as most concepts in law or economics, cannot be measured by metes and bounds. . . .  Obviously no magic inheres in numbers."  *Times-Picayune* v. *United States,* 345 U. S. 594, 611–612.  "Industrial activities cannot be confined to trim categories."  *United States* v. *du Pont,* 351 U. S. 377, 395.  The claimed deficiencies in the record cannot sweep aside the existence of a large area of effective competition between the makers of cans and the makers of glass containers.  We know enough to conclude that the rivalry between cans and glass containers is pervasive and that the area of competitive overlap between these two product markets is broad enough to make the position of the individual companies within their own industries very relevant to the merger's impact within the broader competitive area that embraces both of the merging firms' respective industries.

Glass and metal containers were recognized to be two separate lines of commerce.  But given the area of effec-

---

[9] An official of the Glass Container Manufacturers Institute described that organization's advertising program as three-pronged, directed at the packer, the retailer, and the ultimate consumer.

tive competition between these lines, there is necessarily implied one or more other lines of commerce embracing both industries. Since the purpose of delineating a line of commerce is to provide an adequate basis for measuring the effects of a given acquisition, its contours must, as nearly as possible, conform to competitive reality. Where the area of effective competition cuts across industry lines, so must the relevant line of commerce; otherwise an adequate determination of the merger's true impact cannot be made.

Based on the evidence thus far revealed by this record we hold that the interindustry competition between glass and metal containers is sufficient to warrant treating as a relevant product market the combined glass and metal container industries and all end uses for which they compete. There may be some end uses for which glass and metal do not and could not compete, but complete interindustry competitive overlap need not be shown. We would not be true to the purpose of the Clayton Act's line of commerce concept as a framework within which to measure the effect of mergers on competition were we to hold that the existence of noncompetitive segments within a proposed market area precludes its being treated as a line of commerce.

This line of commerce was not pressed upon the District Court. However, since it is coextensive with the two industries, which were held to be lines of commerce, and since it is composed largely, if not entirely, of the more particularized end-use lines urged in the District Court by the Government, we see nothing to preclude us from reaching the question of its prima facie existence at this stage of the case.

Nor are we concerned by the suggestion that if the product market is to be defined in these terms it must include plastic, paper, foil and any other materials competing for the same business. That there may be a

broader product market made up of metal, glass and other competing containers does not necessarily negative the existence of submarkets of cans, glass, plastic or cans and glass together, for "within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co.* v. *United States,* 370 U. S., at 325.

## III.

We approach the ultimate judgment under § 7 having in mind the teachings of *Brown Shoe,* supplemented by their application and elaboration in *United States* v. *Philadelphia National Bank,* 374 U. S. 321, and *United States* v. *El Paso Natural Gas Co.,* 376 U. S. 651. The issue is whether the merger between Continental and Hazel-Atlas will have probable anticompetitive effect within the relevant line of commerce. Market shares are the primary indicia of market power but a judgment under § 7 is not to be made by any single qualitative or quantitative test. The merger must be viewed functionally in the context of the particular market involved, its structure, history and probable future. Where a merger is of such a size as to be inherently suspect, elaborate proof of market structure, market behavior and probable anticompetitive effects may be dispensed with in view of § 7's design to prevent undue concentration. Moreover, the competition with which § 7 deals includes not only existing competition but that which is sufficiently probable and imminent. See *United States* v. *El Paso Natural Gas Co., supra.*

Continental occupied a dominant position in the metal can industry. It shipped 33% of the metal cans shipped by the industry and together with American shipped about 71% of the industry total. Continental's share amounted to 13 billion metal containers out of a total of 40 billion and its $433 million gross sales of metal con-

tainers amounted to 31.4% of the industry's total gross of $1,380,000,000. Continental's total assets were $382 million, its net sales and operating revenues $666 million.

In addition to demonstrating the dominant position of Continental in a highly concentrated industry, the District Court's findings clearly revealed Continental's vigorous efforts all across the competitive front between metal and glass containers. Continental obviously pushed metal containers wherever metal containers could be pushed. Its share of the beer can market ran from 43% in 1955 to 46% in 1957. Its share of both beer can and beer bottle shipments, disregarding the returnable bottle factor, ran from 36% in 1955 to 38% in 1957. Although metal cans have so far occupied a relatively small percentage of the soft drink container field, Continental's share of this can market ranged from 36% in 1955 to 26% in 1957 and its portion of the total shipments of glass and metal soft drink and beverage containers, disregarding the returnable bottle factor, was 7.2% in 1955, approximately 5.4% in 1956 and approximately 6.2% in 1957 (for 1956 and 1957 these figures include Hazel-Atlas' share). In the category covering all nonfood products, Continental's share was approximately 30% of the total shipments of metal containers for such uses.

Continental's major position in the relevant product market—the combined metal and glass container industries—prior to the merger is undeniable. Of the 59 billion containers shipped in 1955 by the metal (39¾ billion) and glass (19⅓ billion) industries, Continental shipped 21.9%, to a great extent dispersed among all of the end uses for which glass and metal compete.[10] Of the six largest firms in the product market, it ranked second.

---

[10] Determination of market shares is made somewhat more difficult in this case than in the ordinary intraindustry merger because the indices of total production of the two industries are expressed differently, the metal container industry reporting to the Census

When Continental acquired Hazel-Atlas it added sig-
nificantly to its position in the relevant line of commerce.
Hazel-Atlas was the third largest glass container manu-
facturer in an industry in which the three top companies
controlled 55.4% of the total shipments of glass con-
tainers. Hazel-Atlas' share was 9.6%, which amounted to
1,857,000,000 glass containers out of a total of 19⅓ billion
industrial total. Its annual sales amounted to $79 mil-
lion, its assets exceeded $37 million and it had 13 plants
variously located in the United States. In terms of total
containers shipped, Hazel-Atlas ranked sixth in the rele-
vant line of commerce, its almost 2 billion containers
being 3.1% of the product market total.

---

Bureau in terms of tinplate consumed in manufacture, and the glass
container industry in terms of units of containers. On the basis of
figures and data supplied by the Census Bureau and the Can Manu-
facturers Institute the Government has derived a conversion factor
showing the relationship between tinplate consumption and total con-
tainers manufactured, thereby permitting a comparison of the rela-
tive positions of the firms competing within the glass and metal
container line of commerce. It would appear that the District Court
relied on figures disclosed by application of this factor, since it
found that American and Continental shipped approximately 38%
and 33%, respectively, of the metal cans sold in the United States.
217 F. Supp., at 773.

Continental objects to the use of this conversion scheme, however,
arguing that it ignores such considerations as size of cans and the
returnable feature of some types of bottles. We are not persuaded.
Since different systems of statistical notation are employed by these
industries, a common referential standard is an absolute prerequisite
to a comparison of market shares. Consistent with this Court's
declarations in other cases concerning the high degree of relevance of
market shares to the effect of mergers on competition, we believe that
slight variations one way or the other which may inhere in the use
of a conversion formula should not blind us to the broad significance
of the resulting percentages. In the compilation of statistics "pre-
cision in detail is less important than the accuracy of the broad
picture presented." *Brown Shoe Co.* v. *United States,* 370 U. S., at
342, n. 69.

.

The evidence so far presented leads us to conclude that the merger between Continental and Hazel-Atlas is in violation of § 7. The product market embracing the combined metal and glass container industries was dominated by six firms having a total of 70.1% of the business.[11] Continental, with 21.9% of the shipments, ranked second within this product market, and Hazel-Atlas, with 3.1%, ranked sixth. Thus, of this vast market—amounting at the time of the merger to almost $3 billion in annual sales—a large percentage already belonged to Continental before the merger. By the acquisition of Hazel-Atlas stock Continental not only increased its own share more than 14% from 21.9% to 25%, but also reduced from five to four the most significant competitors who might have threatened its dominant position. The resulting percentage of the combined firms approaches that held presumptively bad in *United States* v. *Philadelphia National Bank,* 374 U. S. 321, and is almost the same as that involved in *United States* v. *Aluminum Co. of America,* 377 U. S. 271. The incremental addition to the acquiring firm's share is considerably larger than in *Aluminum Co.* The case falls squarely within the principle that where there has been a "history of tendency toward concentration in the industry" tendencies toward further concentration "are to be curbed in their incipiency." *Brown Shoe Co.* v. *United States,* 370 U. S., at 345, 346. Where "concentration is already great, the importance of pre-

---

[11] The six largest firms, and their respective percentages of the relevant market as of the year prior to the merger are:

| | |
|---|---|
| American Can Co | 26.8% |
| Continental Can Co | 21.9% |
| Owens-Illinois Glass Co | 11.2% |
| Anchor-Hocking Glass Co | 3.8% |
| National Can Co | 3.3% |
| Hazel-Atlas Glass Co | 3.1% |
| Total | 70.1% |

venting even slight increases in concentration and so pre-
serving the possibility of eventual deconcentration is
correspondingly great." *United States* v. *Philadelphia
National Bank,* 374 U. S. 321, 365, n. 42; *United States* v.
*Aluminum Co. of America, supra.*

Continental insists, however, that whatever the nature
of interindustry competition in general, the types of con-
tainers produced by Continental and Hazel-Atlas at the
time of the merger were for the most part not in compe-
tition with each other and hence the merger could have
no effect on competition. This argument ignores several
important matters.

First: The District Court found that both Continental
and Hazel-Atlas were engaged in interindustry competi-
tion characteristic of the glass and metal can industries.
While the position of Hazel-Atlas in the beer and soft
drink industries was negligible in 1955, its position was
quite different in other fields. Hazel-Atlas made both
wide-mouthed glass jars and narrow-necked containers
but more of the former than the latter. Both are used in
packing food, medicine and health supplies, household and
industrial products and toiletries and cosmetics, among
others, and Hazel-Atlas' position in supplying the pack-
aging needs of these industries was indeed important. In
1955, it shipped about 8% of the narrow-necked bottles
and about 14% of the wide-mouthed glass containers for
food; about 10% of the narrow-necked and 40% of the
wide-mouthed glass containers for the household and
chemical industry; about 9% of the narrow-necked and
28% of the wide-mouthed glass containers for the toilet-
ries and cosmetics industry; and about 6% of the narrow-
necked and 25% of the wide-mouthed glass containers for
the medicine and health industry. Continental, as we
have said, in 1955 shipped 30% of the containers used
for these same nonfood purposes. In these industries the
District Court found that the glass container and metal

container manufacturers were each seeking to promote their lines of containers at the expense of the other lines and that all were attempting to improve their products or to develop new ones so as to have a wider customer appeal. We think it quite clear that Continental and Hazel-Atlas were set off directly against one another in this process and that the merger therefore carries with it the probability of foreclosing actual and potential competition between these two concerns. Hazel-Atlas has been removed as an independent factor in the glass industry and in the line of commerce which includes both metal cans and glass containers.

We think the District Court erred in placing heavy reliance on Continental's management of its Hazel-Atlas division after the merger while Continental was under some pressure because of the pending government antitrust suit. Continental acquired by the merger the power to guide the development of Hazel-Atlas consistently with Continental's interest in metal containers; contrariwise it may find itself unwilling to push metal containers to the exclusion of glass for those end uses where Hazel-Atlas is strong. It has at the same time acquired the ability, know-how and the capacity to satisfy its customers' demands whether they want metal or glass containers. Continental need no longer lose customers to glass companies solely because consumer preference, perhaps triggered by competitive efforts by the glass container industry, forces the packer to turn from cans to glass. And no longer does a Hazel-Atlas customer who has normally packed in glass have to look elsewhere for metal containers if he discovers that the can rather than the jar will answer some of his pressing problems.

Second: Continental would view these developments as representing an acceptable effort by it to diversify its product lines and to gain the resulting competitive advantages, thereby strengthening competition which it

declared the antitrust laws are designed to promote. But we think the answer is otherwise when a dominant firm in a line of commerce in which market power is already concentrated among a few firms makes an acquisition which enhances its market power and the vigor and effectiveness of its own competitive efforts.

Third: A merger between the second and sixth largest competitors in a gigantic line of commerce is significant not only for its intrinsic effect on competition but also for its tendency to endanger a much broader anticompetitive effect by triggering other mergers by companies seeking the same competitive advantages sought by Continental in this case. As the Court said in *Brown Shoe*, "[i]f a merger achieving 5% control were now approved, we might be required to approve future merger efforts by Brown's competitors seeking similar market shares." 370 U. S., at 343–344.

Fourth: It is not at all self-evident that the lack of current competition between Continental and Hazel-Atlas for some important end uses of metal and glass containers significantly diminished the adverse effect of the merger on competition. Continental might have concluded that it could effectively insulate itself from competition by acquiring a major firm not presently directing its market acquisition efforts toward the same end uses as Continental, but possessing the potential to do so. Two examples will illustrate. Both soft drinks and baby food are currently packed predominantly in glass, but Continental has engaged in vigorous and imaginative promotional activities attempting to overcome consumer preferences for glass and secure a larger share of these two markets for its tin cans. Hazel-Atlas was not at the time of the merger a significant producer of either of these containers, but with comparatively little difficulty, if it were an independent firm making independent business judg-

ments, it could have developed its soft drink and baby food capacity. The acquisition of Hazel-Atlas by a company engaged in such intense efforts to effect a diversion of business from glass to metal in both of these lines cannot help but diminish the likelihood of Hazel-Atlas realizing its potential as a significant competitor in either line. Our view of the record compels us to disagree with the District Court's conclusion that Continental, as a result of the merger, was not "likely to cease being an innovator in either [the glass or metal container] line." 217 F. Supp., at 790. It would make little sense for one entity within the Continental empire to be busily engaged in persuading the public of metal's superiority over glass for a given end use, while the other is making plans to increase the Nation's total glass container output for that same end use. Thus, the fact that Continental and Hazel-Atlas were not substantial competitors of each other for certain end uses at the time of the merger may actually enhance the long-run tendency of the merger to lessen competition.

We think our holding is consonant with the purpose of § 7 to arrest anticompetitive arrangements in their incipiency. Some product lines are offered in both metal and glass containers by the same packer. In such areas the interchangeability of use and immediate interindustry sensitivity to price changes would approach that which exists between products of the same industry. In other lines, as where one packer's products move in one type container while his competitor's move in another, there are inherent deterrents to customer diversion of the same type that might occur between brands of cans or bottles. But the possibility of such transfers over the long run acts as a deterrent against attempts by the dominant members of either industry to reap the possible benefits of their position by raising prices above the competitive

level or engaging in other comparable practices. And even though certain lines are today regarded as safely within the domain of one or the other of these industries, this pattern may be altered, as it has been in the past. From the point of view not only of the static competitive situation but also the dynamic long-run potential, we think that the Government has discharged its burden of proving prima facie anticompetitive effect. Accordingly the judgment is reversed and the case remanded for further proceedings consistent with this opinion.

*Reversed.*

MR. JUSTICE GOLDBERG, concurring.

I fully agree with the Court that "[s]ince the purpose of delineating a line of commerce is to provide an adequate basis for measuring the effects of a given acquisition, its contours must, as nearly as possible, conform to competitive reality." *Ante,* at p. 457. I also agree that "on the evidence thus far revealed by this record," there has been a prima facie showing "that the interindustry competition between glass and metal containers . . . [warrants] treating as a relevant product market the combined glass and metal container industries and all end uses for which they compete." *Ibid.* I wish to make it clear, however, that, as I read the opinion of the Court, the Court does not purport finally to decide the determinative line of commerce. Since the District Court "dismissed the complaint at the close of the Government's case," *ante,* at p. 444, upon remand it will be open to the defendants not only to rebut the prima facie inference that metal and glass containers may be considered together as a line of commerce but also to prove that plastic or other containers in fact compete with metal and glass to such an extent that as a matter of "competitive reality" they must be considered as part of the determinative line of commerce.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting.

Measured by any antitrust yardsticks with which I am familiar, the Court's conclusions are, to say the least, remarkable. Before the merger which is the subject of this case, Continental Can manufactured metal containers and Hazel-Atlas manufactured glass containers.[1] The District Court found, with ample support in the record, that the Government had wholly failed to prove that the merger of these two companies would adversely affect competition in the metal container industry, in the glass container industry, or between the metal container industry and the glass container industry. Yet this Court manages to strike down the merger under § 7 of the Clayton Act, because, in the Court's view, it is anticompetitive.[2] With all respect, the Court's conclusion is based on erroneous analysis, which makes an abrupt and unwise departure from established antitrust law.

I agree fully with the Court that "we must recognize meaningful competition where it is found," *ante,* p. 449, and that "inter-industry" competition, such as that involved in this case, no less than "intra-industry" competition is protected by § 7 from anticompetitive mergers. As

---

[1] Both companies manufactured other related products which for present purposes may be disregarded. See the description of the two companies in the opinion of the District Court, 217 F. Supp. 761, 769–770.

[2] Section 7 of the Clayton Act, as amended by the Act of December 29, 1950, 64 Stat. 1125, 15 U. S. C. § 18, provides in pertinent part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

this Court has, in effect, recognized in past cases, the concept of an "industry," or "line of commerce," is not susceptible of reduction to a precise formula. See *Brown Shoe Co., Inc., v. United States,* 370 U. S. 294, 325; *United States* v. *E. I. du Pont de Nemours & Co.,* 351 U. S. 377, 394–396; *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, 611. It would, therefore, be artificial and inconsistent with the broad protective purpose of § 7, see *Brown Shoe, supra,* at 311–323, to attempt to differentiate between permitted and prohibited mergers merely by asking whether a probable reduction in competition, if it is found, will be within a single "industry" or between two or more "industries."

Recognition that the purpose of § 7 is not to be thwarted by limiting its protection to intramural competition within strictly defined "industries," does not mean, however, that the concept of a "line of commerce" is no longer serviceable. More precisely, it does not, as the majority seems to think, entail the conclusion that wherever "meaningful competition" exists, a "line of commerce" is to be found. The Court declares the initial question of this case to be "whether the admitted competition between metal and glass containers for uses other than packaging beer was of the type and quality deserving of § 7 protection and *therefore* the basis for defining a relevant product market." *Ante,* p. 449. (Emphasis added.) And the Court's answer is similarly phrased: ". . . [W]e hold that *the interindustry competition* between glass and metal containers *is sufficient ·to warrant treating as a relevant product market* the combined glass and metal container industries and all end uses for which they compete." *Ante,* p. 457. (Emphasis added.) Quite obviously, such a conclusion simply reads the "line of commerce" element out of § 7, and destroys its usefulness as an aid to analysis.

The distortions to which this approach leads are evidenced by the Court's application of it in this case.

Having found that there is "interindustry competition be-
tween glass and metal containers" the Court concludes
that "the combined glass and metal container industries"
is the relevant line of commerce or "product market" in
which anticompetitive effects must be measured. *Ante,*
p. 457. Applying that premise, the Court then notes Con-
tinental's "dominant position" in the *metal can industry,
ante,* p. 458, and finds that Continental has a "major posi-
tion" in the "relevant product market—*the combined
metal and glass container industries," ante,* p. 459. (Em-
phasis added.) Hazel-Atlas, being the third largest pro-
ducer of *glass containers,* is found to rank sixth in the
relevant product market—again, the combined metal and
glass container industries. *Ante,* p. 460. This "evi-
dence," coupled with the market shares of Continental
and Hazel-Atlas in the combined product market,[3] leads
the Court to conclude that the merger violates § 7.

"The resulting percentage of the combined firms," the
Court says, "approaches that held presumptively bad in
*United States* v. *Philadelphia National Bank,* 374 U. S.
321." *Ante,* p. 461. The *Philadelphia Bank* case, which
involved the merger of two banks plainly engaged in
the same line of commerce,[4] is, however, entirely dis-
tinct from the present situation, which involves two sepa-
rate industries. The bizarre result of the Court's ap-

---

[3] The Court confesses to some difficulty in determining market
shares. See *ante,* pp. 459–460, n. 10.

[4] "We have no difficulty in determining the 'line of commerce'
(relevant product or services market) . . . in which to appraise the
probable competitive effects of appellees' proposed merger. We agree
with the District Court that the cluster of products (various kinds
of credit) and services (such as checking accounts and trust adminis-
tration) denoted by the term 'commercial banking'. . . composes a
distinct line of commerce. . . . In sum, it is clear that commercial
banking is a market 'sufficiently inclusive to be meaningful in terms
of trade realities.' *Crown Zellerbach Corp.* v. *Federal Trade
Comm'n,* 296 F. 2d 800, 811 (C. A. 9th Cir. 1961)." 374 U. S.,
at 356–357.

proach is that market percentages of a nonexistent market enable the Court to dispense with "elaborate proof of market structure, market behavior and probable anticompetitive effects," *ante,* p. 458. As I shall show, the Court has "dispensed with" proof which, given heed, shows how completely fanciful its market-share analysis is.

In fairness to the District Court it should be said that it did not err in failing to consider the "line of commerce" on which this Court now relies. For the Government did not even suggest that such a line of commerce existed until it got to this Court.[5] And it does not seriously suggest even now that such a line of commerce exists.[6] The truth

---

[5] In the District Court, the Government relied on 10 "lines of commerce." In addition to "the packaging industry," "the can industry," "the glass container industry," and "metal closures" (not relevant here), the Government argued that there were six "lines of commerce" which were defined by the end product for which the containers were used, *e. g.,* "containers for the beer industry." See 217 F. Supp., at 778–779.

[6] Although the Government makes the suggestion, which the Court now accepts, that wherever there is competition there is a "line of commerce," so that "the 'line of commerce' within which the merger's effect on competition should be appraised is the production and sale of containers used for all purposes for which metal or glass containers may be used . . ." (Brief, p. 18), it concedes the artificiality of this approach and, in so doing, itself rejects the market-share analysis adopted by the Court. The Government states that its suggested test of illegality of a merger involving inter-industry competition "omits analysis of statistics regarding market shares simply because those traditional yardsticks are generally unavailable to measure the full consequences which an interindustry merger would have on competition." (Brief, p. 22.)

The test which the Government advocates is that it "can satisfy its burden of showing that the merger may have the effect of substantially lessening competition by proving (a) the existence of substantial competition between two industries; (b) a high degree of concentration in either or both of the competing industries; and (c) the dominant positions of each of the merging companies in its respective industry." (Brief, p. 22.) This approach, which has at least the virtue of facing up to its own logic, frankly disavows atten-

is that "glass and metal containers" form a distinct line of commerce only in the mind of this Court.

The District Court found, and this Court accepts the finding, that this case "deals with three separate and distinct industries manufacturing separate and distinct types of products": metal, glass, and plastic containers. 217 F. Supp., at 780.

> "Concededly there was substantial and vigorous inter-industry competition between these three industries and between various of the products which they manufactured. Metal can, glass container and plastic container manufacturers were each seeking to enlarge their sales to the thousands of packers of hundreds of varieties of food, chemical, toiletry and industrial products, ranging from ripe olives to fruit juices to tuna fish to smoked tongue; from maple syrup to pet food to coffee; from embalming fluid to floor wax to nail polish to aspirin to veterinary supplies, to take examples at random.
>
> "Each industry and each of the manufacturers within it was seeking to improve their products so that they would appeal to new customers or hold old ones. Hazel-Atlas and Continental were part of this overall industrial pattern, each in a recognized separate industry producing distinct products but engaged in inter-industry competition for the favor of various end users of their products." 217 F. Supp., at 780–781.

tion to a "line of commerce." The effect of the Court's approach is not markedly different from that of the Government's test, see *infra,* p. 476, and there is some suggestion in the last few pages of the Court's opinion that the Court appreciates this. As discussed hereafter, however, there is nothing in the Court's opinion to support adoption of the Government's *"per se"* approach, and the facts developed in the District Court demonstrate that, so far as one can tell from this case at least, a *per se* approach to the problem of inter-industry competition is wholly inappropriate.

Only this Court will not be "concerned," *ante,* p. 457, that without support in reason or fact, it dips into this network of competition and establishes metal and glass containers as a separate "line of commerce," leaving entirely out of account all other kinds of containers: "plastic, paper, foil and any other materials competing for the same business," *ibid.*[7] *Brown Shoe, supra,* on which the Court relies for this travesty of economics, *ante,* p. 458, spoke of *"well-defined* submarkets" within a broader market, and said that "the boundaries of such a submarket" were to be determined by *"practical indicia,"* 370 U. S., at 325.[8] (Emphasis added.) Since the Court here provides its own definition of a market, unrelated to any market reality whatsoever, *Brown Shoe* must in this case be regarded as a bootstrap.

The Court is quite wrong when it says that the District Court "employed an unduly narrow construction of the 'competition' protected by § 7" and that it held that "the competition protected by § 7 [is limited] to competition between identical products," *ante,* p. 452. Quite to the contrary, the District Court expressly stated that

---

[7] If the competition between metal and glass containers is sufficient to constitute them collectively a "line of commerce," why does their competition with plastic containers and "other materials competing for the same business" not require that all such containers be included in the same line of commerce? The Court apparently concedes that the competition is multilateral.

[8] The "practical indicia" specified by the Court were: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U. S., at 325 (footnote omitted). While many of these factors weigh *against* the Court's conclusion that metal and glass containers should be combined in a single line of commerce, not one of them speaks for the Court's conclusion that they should be segregated from all other kinds of containers and together form a separate line of commerce.

"Section 7 is applicable to conglomerate mergers where the facts warrant," 217 F. Supp., at 783 (footnote omitted).[9] The difference between the District Court and this Court lies rather in the District Court's next sentence: "But there must be evidence that the facts warrant such application." *Ibid.*

If attention is paid to the conclusions of the court below, it is obvious that this Court's analysis has led it to substitute a meaningless figure—the merged companies' share of a nonexistent "market"—for the sound, careful factual findings of the District Court.

The District Court found:[10]

(1) With respect to the merger's effect on competition within the metal container industry, that "prior to its acquisition Hazel-Atlas did not manufacture or sell metal cans . . . ." 217 F. Supp., at 770.

(2) With respect to the merger's effect on competition within the glass container industry, that "Continental did not, directly or through subsidiaries, manufacture or sell glass containers . . . ." *Ibid.*

---

[9] The District Court observed also that "relevant markets are neither economic abstractions nor artificial conceptions." 217 F. Supp., at 768. In this respect, in view of the majority's present opinion, the district judge must, I suppose, be deemed to have erred.

[10] This summary of the District Court's findings includes only so much as is relevant to the majority's opinion. The District Court gave detailed attention to each of the Government's contentions, in an opinion of 48 pages. Its conclusions were summarized in the following statement:

"Viewing the evidence as a whole, quite apart from theory, there was a total failure by the Government to establish the essential elements of a violation of Section 7. As will be apparent from a discussion of the proof relating to each specific line of commerce, the Government did not lay either the statistical or testimonial foundations required to establish its case. It was this failure of proof which required the dismissal of the complaint and entry of judgment for the defendants." 217 F. Supp., at 787.

(3) With respect to the merger's effect on the metal container industry's efforts to compete with the glass container industry,

"The Government fared no better on its claim that as a result of the merger Continental was likely to lose the incentive to push can sales at the expense of glass. The Government introduced no evidence showing either that there had been or was likely to be any slackening of effort to push can sales. On the contrary, as has been pointed out, the object of the merger was diversification, and Continental was actively promoting intra-company competition between its various product lines. Since by far the largest proportion of Continental's business was in metal cans, it scarcely seemed likely that cans would suffer at the expense of glass.

"Moreover, subsequent to the merger Continental actively engaged in a vigorous research and promotion program in both its metal and glass container lines. *In the light of the record and of the competitive realities, the notion that it was likely to cease being an innovator in either line is patently absurd.*" 217 F. Supp., at 790 (footnote omitted). (Emphasis added.)

(4) With respect to the merger's effect on the glass container industry's efforts to compete with the metal container industry,

"In addition the Government advanced the converse of the proposition which it urged with respect to the metal can line—that as a result of the merger Continental was likely to lose the incentive to push glass container sales at the expense of cans. In view of what has been said concerning the purpose of Continental's diversification program and the course it pursued after the merger, it is no more likely that Continental would slacken its efforts to promote glass

than that it would slacken its efforts to promote cans. Indeed, if it had planned to do so there would have been little, if any, point to acquiring Hazel-Atlas, a major glass container producer." 217 F. Supp., at 793.

It is clear from the foregoing that the District Court fully considered the possibility that a merger of leading producers in two industries between which there was competition would dampen the inter-industry rivalry. The basis of the decision below was not, therefore, an erroneous belief that § 7 did not reach such competition but a careful study of the Government's proof, which led to the conclusion that "in the light of the record and of the competitive realities, the notion that . . . [the merged company] was likely to cease being an innovator in either line is patently absurd."

Surely this failure of the Court's mock-statistical analysis to reflect the facts as found on the record demonstrates what the Government concedes,[11] and what one would in any event have thought to be obvious: When a merger is attacked on the ground that competition *between* two distinct industries, or lines of commerce, will be affected, the shortcut "market share" approach developed in the *Philadelphia Bank* case, see 374 U. S., at 362–365; *ante,* p. 458, has no place. In such a case, the legality of the merger must surely depend, as it did below, on an inquiry into competitive effects in the actual lines of commerce which are involved. In this case, the result depends—or should depend—on the impact of the merger in the two lines of commerce here involved: the metal container industry and the glass container industry.[12] As the find-

---

[11] See note 6, *supra.*

[12] The Government urged other lines of commerce below, see note 5, *supra,* but has abandoned all of them here except "containers for the canning industry," a line of commerce defined by end use and including "all metal cans and glass containers for the end uses of 'canning'

ings of the District Court which are quoted above make plain, reference to these two actual lines of commerce does not preclude protection of inter-industry competition. Indeed, by placing the merged company in the setting of other companies in each of the respective lines of commerce which are also engaged in inter-industry competition, this approach is far more likely than the Court's to give § 7 full, but not artificial, scope.

The Court's spurious market-share analysis should not obscure the fact that the Court is, in effect, laying down a *"per se"* rule that mergers between two large companies in related industries are presumptively unlawful under § 7. Had the Court based this new rule on a conclusion that such mergers are inherently likely to dampen inter-industry competition or that so few mergers of this kind would fail to have that effect that a *"per se"* rule is justified, I could at least understand the thought process which lay behind its decision. It would, of course, be inappropriate to prescribe *per se* rules in the first case to present a problem, cf. *White Motor Co.* v. *United States,* 372 U. S. 253, let alone a case in which the facts suggest that a *per se* rule is unsound. And to lay down a rule on either of the bases suggested would require a much more careful look at the nature of competition between industries than the Court's casual glance in that direction.

In any event, the Court does not take this tack. It chooses instead to invent a line of commerce the existence of which no one, not even the Government, has imagined; for which businessmen and economists will look in vain; a line of commerce which sprang into existence only when the merger took place and will cease to exist when the

food." 217 F. Supp., at 799. The District Court gave detailed reasons, which the record fully supports, for rejecting the Government's contention that this was a distinct line of commerce. See 217 F. Supp., at 799–802.

merger is undone. I have no idea where § 7 goes from here, nor will businessmen or the antitrust bar. Hitherto, it has been thought that the validity of a merger was to be tested by examining its effect in identifiable, "well-defined" (*Brown Shoe, supra,* at 325) markets. Here-after, however slight (or even nonexistent) the com-petitive impact of a merger on any actual market, businessmen must rest uneasy lest the Court create some "market," in which the merger presumptively dampens competition, out of bits and pieces of real ones. No one could say that such a fear is unfounded, since the Court's creative powers in this respect are declared to be as extensive as the competitive relationships be-tween industries. This is said to be recognizing "mean-ingful competition where it is found to exist." It is in fact imagining effects on competition where none has been shown.

I would affirm the judgment of the District Court.