**SCIENCE PRODUCTS COMPANY, INC.,**
a corporation, Plaintiff,

v.

**CHEVRON CHEMICAL COMPANY, INC.,**
a corporation, Defendant.

**No. 69 C 2647.**

United States District Court,
N. D. Illinois, E. D.

Nov. 19, 1974.

———◆———

Jenner & Block, Robert F. Hanley, Clarold L. Britton, Robert C. Keck, Jr., Chicago, Ill., Robert A. Spanner, Lisle, Ill., for plaintiff.

Mayer, Brown & Platt, H. Templeton Brown, Wm. Bruce Hoff, Jr., Robert F. Finke, Michael R. Feagley, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

ROBSON, Chief Judge.

Plaintiff, Science Products Company, Inc. ("Science"), has brought a three count complaint against Chevron Chemical Company, Inc. ("Chevron"), for trademark infringement, unfair competition, and violations of the Sherman Act, 15 U.S.C. § 1 et seq. Count III alleges two offenses in violation of Section 2 of the Sherman Act: that Chevron has monopolized or attempted to monopolize the relevant market for garden chemicals in the United States.

██ This matter is now before the court for a preliminary determination of the relevant market. There is no dispute with regard to the geographic market being national. The difference comes with regard to the product market. The burden of this issue is upon the plaintiff. It must establish by a preponderance of the evidence that the alleged market is cognizable under the Sherman Act.

Science contends that the relevant market for purposes of its antitrust charges is defined as follows:

"The national market for small package garden chemicals used in the home garden. The products in the market include products similar to those listed in Chevron's 1970 'Garden and Lawn Chemicals Distributor Price List' but excluding those products listed therein under the heading 'Household Program.'"

Science specifically excludes products which it categorizes as "dry fertilizers" and "household insecticides." Chevron has defined the market as "the market for all products which affect plant or insect life in and around the home" and specifically includes both "dry fertilizers" and "household insecticides."

Pursuant to this court's order of July 2, 1974, the parties submitted to the court briefs, affidavits and various exhibits supporting their respective definitions of the relevant product market as an element of Science's antitrust claims. This memorandum opinion represents the court's preliminary findings with regard to the relevant market issue and, unless significant new evidence is introduced at trial, will constitute the court's final findings of fact and conclusions of law as to this issue.

After a careful review of the evidence and the law, the court is of the opinion that Science has failed to demonstrate by a preponderance of the evidence that the market alleged in the complaint constitutes a relevant market for purposes of the Sherman Act and that the market must be redefined to include all products which affect plant or insect life in and around the home. Specifically, the relevant product market consists of the following categories of products:

1. Fertilizers, liquid and dry.

2. Pesticides. These include herbicides, fungicides and insecticides used both inside and outside the home.

3. Combination products. These products combine fertilizers with herbicides, insecticides and fungicides.

4. Applicators.

5. Specialty products. These products have a wide variety of specialized applications to plant and insects.

## I. The Standards

The leading case discussing the relevant product market is the *Cellophane* case. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). There, the issue was whether the product market would consist of all flexible packaging materials or merely cellophane. Initial-

ly, the Court noted that the Sherman Act did not require products to be either fungible or physically identical to be included within the same product market. 351 U.S. at 394, 76 S.Ct. 994. What is required is an appraisal of the "cross-elasticity of demand" between the products sought to be included in the putative market as well as consideration of whether those products are "reasonably interchangeable."

"Cross-elasticity of demand" between products is measured by "the responsiveness of the sales of one product to price changes of the other." The court then added: "If a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand exists between them; that the products compete in the same market." 351 U.S. at 400, 76 S.Ct. at 1010.

By contrast, products are "reasonably interchangeable" when use and physical characteristics are found to be comparable. In explaining this factor, the Court cautioned that:

> "The varying circumstances of each case determine the result. In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." 351 U.S. at 395, 76 S.Ct. at 1007 (footnotes and citations omitted).

Based on these considerations, the Court found that the relevant market was the market for flexible packaging materials.

The standard of "reasonable interchangeability" was reaffirmed in Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), where the Court also noted the possibility of the existence of "submarkets":

> "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes . . . . The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." (Footnotes and citations omitted).

■ In defining the relevant product market, the Supreme Court has directed that economic and commercial realities must be examined. United States v. Continental Can Co., 378 U.S. 441, 449, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); Brown Shoe Co., Inc. v. United States, *supra*, 370 U.S. at 336, 82 S.Ct. 1502. If competition cuts across product or industry lines, the product market must be drawn broadly to include competition as it exists. United States v. General Dynamics Corporation, 341 F.Supp. 534, 555 (N.D.Ill.1972), aff'd, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). Moreover, "the court must be wary of falling into the temptation of tailoring the market to the dimensions of the defendant's business." Cass Student Advertising, Inc. v. National Educational Advertising Services, Inc., 374 F.Supp. 796 (N.D.Ill.1974, Decker J.).

## II. Dry Lawn Fertilizers

In its initial brief, Science contended that the relevant market included products similar to those listed in Chevron's 1970 "Garden and Lawn Chemicals Distributor Price List." This list sets out a wide variety of products including fertilizers, insecticides, fungicides, combination products, applicators and various specialty products intended for both lawn and garden use. The overwhelming majority of these products are in

liquid form. Specifically excluded from the market were those products Science categorized as being "dry fertilizers." Science did not delineate the specific products it sought to exclude, as the court directed, but merely alluded to Chevron's 1970 "Lawn and Garden Dry Fertilizers Distributor Price List" as being illustrative of "dry fertilizers." The latter price list includes insecticides, herbicides, fertilizers and applicators intended for use in both the garden and the lawn. The common element possessed by each of these chemical products is that they are in dry form. Thus the clear dichotomy drawn by Science was between *liquid* lawn and garden chemicals and *dry* lawn and garden chemicals.

Science, in its reply brief, to the amazement of the court, substantially altered its definition of the relevant market. Excluded from the revised market are all liquid chemicals appearing in the 1970 "Garden and Lawn Chemicals Distributor Price List" which are intended primarily for lawn use. Included in the revised market are those dry chemicals appearing on the "Lawn and Garden Dry Fertilizers Distributor Price List" which are primarily intended for garden use. The dichotomy now drawn by Science is between products, liquid and dry, intended primarily for *lawn* use and products, liquid and dry, intended primarily for use in the *garden.*

■ After examining the lawn and garden chemical market in light of the criteria established by the Supreme Court, the court is of the opinion that the plaintiffs have failed to establish by a preponderance of the evidence a valid submarket under either theory.

1. Industry and Public Recognition. Science has submitted no evidence of public recognition of any submarket within the lawn and garden chemical field. Science does contend that a submarket consisting of dry lawn chemicals is recognized by the existence of a separate trade association and by Chevron's marketing practices.

The trade association referred to is the Fertilizer Institute. The Institute is concerned solely with the fertilizer industry and not with other lawn and garden chemicals. Science suggests that this fact establishes dry lawn chemicals as a distinct submarket. However, the Fertilizer Institute is basically an association of agricultural fertilizer manufacturers. Very few manufacturers of lawn and garden chemicals belong to it. The industry association subscribed to by almost every manufacturer of lawn and garden chemicals, including both Science and Chevron, is the Chemical Specialties Manufacturers Association. The industry membership of the latter association cuts across the product lines Science seeks to establish and points toward recognition of the lawn and garden chemical field as a unified line of commerce.

Science contends that dry lawn fertilizers constitute a separate market because they receive their own "special advertising and promotion." This contention, however, ignores the express testimony of Mr. Newhart, Science's vice-president and sales manager, that companies marketing both "dry fertilizers and home and garden chemicals . . . would try and weave those two into one merchandising program." (Newhart Dep., pp. 12–13.) Science's assertions are further belied by the recommendations of the Opinion Research Corporation which prepared a marketing survey for Chevron relating to dry lawn fertilizers. That study concluded:

"Ortho [Chevron] should consider marketing a complete lawn and garden program that effectively ties in their pesticide superiority to their fertilizer products. These products seem naturally related to dealer and consumer . . . . Dealers would also welcome product information that gives a consumer knowledge from *his* point of view as a home owner rather than being segmented as a lawn maintainer, a gardener, a tree owner, etc." Lawn Maintainer Study, Vol. II, p. vii.

Finally, Eugene Olshansky, the president of Science, has testified that lawn and garden chemicals constitute a single product market.

"BY MR. HANLEY:

"Q I show you . . . your 1971 distributor prices for Science Products. I call your attention to a title 'Specialties-Growth Regulators-Plant-Food' on one side of the page, and on the other side of the page, 'Insecticides-Fungicides-Combinations,' and on the third page 'Weed, Grass and Vegetation Killers.'

"What is your testimony, sir, with respect to whether the titles which I have read constitute separate or distinct or the same market of products?

\* \* \* \* \* \*

"A These are all garden chemicals sold in the garden chemical market. The difference is in the name of the products. They are shipped together, bought together, sold together. They are displayed in the same places. So there is no real difference between them.

\* \* \* \* \* \*

"BY MR. HANLEY:

"Q Is your testimony then sir, that these are all part and parcel of the same market?

"A Oh, definitely."

(Olshansky Dep., pp. 246–49.)

The price list referred to in the deposition contains products falling into every product category, including dry fertilizers and combination products, products meant for lawn use, products meant for garden use, as well as products intended for use primarily inside the house.

2. Physical Characteristics, Uses and Product Interchangeability. All of the various products or combinations of products in the lawn and garden chemical market are intended to aid plant life and control insects. They each perform that function in differing ways: a fertilizer provides cell-building minerals; a fungicide kills plant diseases; a herbicide kills unwanted nuisance plants; an insecticide kills insects; specialty products perform various specialized tasks relating to lawn and garden care; and applicators apply the various products.

Virtually all of these products are combined to perform two or more functions simultaneously. Their chemical ingredients can be varied to fit particular consumer needs, or to meet specific soil, weather and other environmental conditions. Most are packaged in a variety of forms (liquid, dry, soluble or aerosol) and sizes. Neither the form in which they are marketed nor the size of the container in which they are sold has any effect on the active ingredients contained in the products. Significantly, liquid lawn and garden products contain the same chemical components and are functionally interchangeable with their dry, soluble and aerosol counterparts.

■ It is apparent that the lawn and garden chemical market includes a variety of products which are complementary rather than directly interchangeable or directly competitive with each other. Science concedes this fact but persists in arguing that garden fertilizers are not directly interchangeable with lawn fertilizers and therefore constitute a separate and distinct line of commerce. However, even the briefest survey of Chevron's "Products Manual" demonstrates that it is impossible to generalize about the area in which the lawn and garden products are all used. Many of these products can be, and are, used on the lawn, in the garden and even inside the house. No single group of related products is used exclusively in only one such area, though individual products may be. There is, as a result, substantial overlap of locus of use for these products generally. Moreover, as Science concedes, a relevant product market can include clusters or combinations of products where that combination reflects commercial realities. United States v. E. I. Du Pont De Nemours & Co., *supra,*

351 U.S. at 393, 76 S.Ct. 994; United States v. Continental Can Co., *supra*, 378 U.S. at 456–457, 84 S.Ct. 1738; United States v. Grinnell Corp., 384 U.S. 563, 574, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

3. Production Facilities. The manufacture of dry lawn and garden fertilizers is essentially a two-step process: first, the production of the raw chemical components, *i. e.*, nitrogen, phosphorus, and potash; second, the blending of these components into products suitable for consumer use. The production of the raw chemical components requires expensive and specialized equipment which are beyond the means of most manufacturers. As a result, most companies marketing dry fertilizers purchase their requirements of raw chemicals from a chemical manufacturer and merely mix and repackage them in smaller containers. Even the blending process requires specialized and expensive conveyors and bagging equipment. Moreover, because dry fertilizers are far bulkier than liquid products, substantially more storage area for raw chemicals and finished products would be required. Because of these initial cost barriers, the manufacturing of dry fertilizers tends to be concentrated in a few major corporations whose annual sales exceed $10,000,000.

By contrast, the chemical components of liquid lawn and garden products can be produced in small production facilities with relatively simple equipment. The essential process involves mixing chemicals in a tank and bottling or packaging directly from the mix in the tank. The equipment is small enough to fit inside a garage and can be used to formulate many different kinds of lawn and garden chemicals. This equipment, however, is not suitable for the manufacture of dry fertilizers.

While there is some product distribution at the manufacturer's level between liquid and dry products, that distribution does not have competitive significance. The relative ease of entry into the liquid lawn and garden chemicals field and their interchangeability with dry products allows smaller manufacturers to readily compete with those larger firms possessing the necessary capital to produce dry lawn and garden chemicals. Moreover, since all dry products, whether meant for lawn or garden use, are manufactured by the same process, any lawn-garden product line distinction based on differing production facilities is meaningless.

4. Pricing and Cross-Elasticity of Demand. Channing Jones, National Market Manager of the Home and Garden Department of Chevron's Ortho Division, has testified that in his experience, consumers will generally compare products and prices based on the square foot coverage. Thus, in pricing a bottle of liquid fertilizer, Chevron considers not only the price which a consumer will pay for a competing bottle of liquid fertilizer, but also the price he will pay for a bag of dry fertilizer which would cover the same area of his lawn or garden. And, in pricing a bag of dry fertilizer, Chevron considers the price the consumer would pay for a comparable bottle of liquid fertilizer. As a result, the prices of liquid and dry fertilizers tend to be competitive. In addition, in a situation where the price of either liquid or dry fertilizers substantially exceeds the price of the other, Channing Jones would expect to see an increased demand for the lower-priced product. Channing Jones' unchallenged testimony clearly demonstrates cross-elasticity of demand between liquid and dry fertilizers.

5. Specialized Vendors. In general, lawn and garden chemicals are marketed through a tripartite distribution channel-manufacturer, distributor, retailer— each of which handles a representative line of products. However, some manufacturers, such as O. M. Scott, a leader in sales of dry fertilizers, distribute their products directly and exclusively to retailers.

Lawn and garden chemicals are handled by a variety of retail outlets: nurseries, garden supply shops, hardware stores, department stores, variety shops,

discount stores, feed stores, grocery stores and a few very large drug stores. With the exception of grocery and drug stores, all of these outlets handle a full line of lawn and garden chemicals.

Most lawn and garden chemicals have a limited and highly seasonal market. As a result, most grocery and drug stores, which have a serious demand for shelf space, handle these products only on a seasonal basis. However, many grocery stores, particularly in the South and West, do carry a full line of lawn and garden chemicals on a year round basis. In addition, an increasing number of grocery stores are now selling various types of house plants and, in conjunction therewith, are handling a wider range of home and garden chemicals.

From the foregoing analysis, it is clear that lawn and garden chemicals, whether dry or liquid, are distributed through basically the same channels and reach the ultimate consumer through identical retail outlets.

It is apparent to the court that any attempt to divide the market along the lines of dry as opposed to liquid products may be readily disposed of by reference to the Supreme Court's decision in United States v. Continental Can, *supra*, and this court's subsequent decision in United States v. General Dynamics, *supra*.

In *Continental Can*, the government charged that the merger of a metal container manufacturer with a glass container manufacturer violated Section 7 of the Clayton Act. The Court concluded that the interindustry competition between glass and metal containers was sufficient to warrant treating as a relevant product market the combined glass and metal container industries and all end uses for which they compete. Similarly, in *General Dynamics*, this court grouped coal, gas, oil, uranium and other forms of energy into a single line of commerce because of the high level of interfuel competition. In the instant case, the evidence clearly demonstrates that liquid and dry lawn and garden chemicals are functionally interchangeable and exhibit the same competitive traits as the container and fuel industries.

Science's belated attempt to distinguish lawn from garden chemicals is equally unavailing. Lawn and garden chemicals are produced by the same group of manufacturers, sold through the same channels of distribution, are in part interchangeable and are sold to the same class of consumer. They are, as Eugene Olshansky, Science's president, conceded, part and parcel of the same market.

III. Household Insecticides

Science also seeks to exclude from the relevant market certain "household insecticides" similar to those described under the heading "Household Program" in Chevron's 1970 "Garden and Lawn Chemicals Distributor Price List." These products consist of liquid insecticides suitable for use inside the home and marketed in aerosol cans. Science distinguishes household insecticides from lawn and garden chemicals on the following grounds:

1. The conclusory statements of Eugene Olshansky, president of Science, and Al Livingston, president of Livingston Seed Co., that at the manufacturers' and distributors' level household insecticides are recognized as separate economic entities.

2. Household insecticides are used primarily to kill household insects which are nuisances to humans, whereas lawn and garden insecticides are used to destroy insects which infest and harm plants.

3. Household insecticides are relatively low in terms of toxicity (active killing agent) and are commonly marketed in aerosol form, whereas lawn and garden insecticides are much higher in toxicity and are normally sold in powder form for mixing in solutions and spraying with a mechanical applicator or pouring directly on plants.

4. Household insecticides are sold to a broader range of customers, *i. e.*, home-

**800**

owners and apartment dwellers, whereas lawn and garden insecticides are limited to homeowners with gardens and lawns.

5. Household insecticides and garden insecticides utilize different channels of distribution. Household products are sold predominantly in grocery and drug stores, while lawn and garden products are sold in garden shops and garden departments of department stores.

6. The competitors which dominate the sales of household insecticides are different from those which lead in the area of lawn and garden chemicals.

Science's arguments ignore the competitive realities of the marketplace. Household insecticides share the same chemical components and manufacturing facilities with insecticides labeled and intended for outdoor use. Once a manufacturer enters the lawn and garden chemical field, it can easily expand its product line to include household insecticides. This, in fact, has been the case. For example, S. C. Johnson, one of the leading manufacturers of aerosol household insecticides, also markets lawn and garden products and is presently test-marketing a lawn fertilizer. Similarly, every manufacturer of lawn and garden chemicals also markets at least a few household insecticides.

Significantly, both Science and Chevron manufacture and market products falling into every category including household insecticides. Although some producers of household insecticides tend to concentrate their sales in grocery and drug stores, in general, most distributors and retailers of lawn and garden chemicals also handle household insecticides. Moreover, Science has been unable to point to a single manufacturer which makes any distinction in its organization or personnel based upon products sold for use inside and outside the home.

Science's attempts to distinguish household insecticides from outdoor insecticides based on locus of use must fail. Of the eight products listed under Chevron's "Household Program," six are specifically labeled suitable for outdoor

use. Science's argument that household insecticides are lower in toxicity than products intended for outdoor use is equally specious. Most household insecticides are packaged in aerosol form and therefore in final diluted form. By contrast, many outdoor insecticides are packaged in concentrated form and must be diluted with water before they can safely be used. Once diluted, the toxicity of these products is no stronger and often weaker than the toxicity of household insecticides.

■ Thus, it can reasonably be concluded that household insecticides do not represent a relevant market or submarket.

### IV. Conclusion

■ For the foregoing reasons, the court is of the opinion that, unless significant new evidence is introduced at trial, the relevant product market for the purposes of Science's antitrust claims must be the market for all products which affect plant or insect life in and around the home.