**UNITED STATES of America, Plaintiff,**

v.

**WASTE MANAGEMENT, INC. and EMW Ventures Incorporated, Defendants.**

No. 81 Civ. 1113.

United States District Court, S.D. New York.

April 29, 1983.

U.S. Dept. of Justice, Antitrust Div., by Eric F. Kaplan, Thomas C. Black, John F. Greaney, Christine A. Wardell, J. Robert Kramer II, Robert W. Wilder, Washington, D.C., for plaintiff.

Bell, Boyd & Lloyd by John C. Christie, Jr., Patrick J. Roach, Washington, D.C., Bell, Boyd & Lloyd by Francis J. Higgins, Larry L. Thompson, Michael Sennett, Chicago, Ill., Cleary, Gottlieb, Steen & Hamilton by Evan A. Davis, New York City, for defendants.

## OPINION

GRIESA, District Judge.

This is an action under Section 7 of the Clayton Act, 15 U.S.C. § 18, in which the Government attacks certain aspects of the acquisition of defendant EMW Ventures Incorporated by defendant Waste Management, Inc. The acquisition in question was closed on February 27, 1981. Prior to the acquisition EMW owned a company known as Waste Resources Corporation, which provided solid waste (hereafter "trash") collection and disposal service through 28 subsidiaries in 10 states. Waste Management was also in the trash collection and disposal business, providing service at 140 facilities in 27 states.

The Government attack is directed at operations in Dallas and Houston. Waste Management has a subsidiary in Dallas known as American Container Service ("ACS"). Waste Management has another subsidiary in a Dallas suburb, Lewisville. The name of this subsidiary is Texas Waste Management. Waste Resources had a subsidiary in Dallas named Texas Industrial Disposal Inc. ("TIDI"), which is now operating as a subsidiary of Waste Management. In Houston, Waste Management has a subsidiary named Texas Waste Systems. The former Waste Resources subsidiary, now being operated by Waste Management, is named Gulf Coast Disposal. Since the time of the merger all Dallas and Houston entities have maintained their corporate identities and their separate operations, although now all are subsidiaries of Waste Management.

The action has been tried. This opinion constitutes the Court's findings of fact and conclusions of law.

### Summary of Parties' Contentions and Court's Conclusions

The applicable language of § 7 of the Clayton Act is well known:

"No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital ... of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (Supp. V 1981).

The Government contends that greater Dallas and greater Houston are sections of the country within the meaning of the statute. Defendants concede the local nature of trash collection service, and agree that each of these metropolitan areas (consisting of the central city and certain nearby municipalities) is a separate geographic market. The principal issue between the parties on the subject of geographic market is whether Fort Worth should be included in the market in the Dallas area. Defendants contend that Fort Worth should be included. The Government argues that Fort Worth should be excluded.

The issues relating to the relevant "line of commerce" are somewhat complex. In both the Dallas and Houston areas, the arrangements for the collection of trash vary somewhat depending on the particular municipality. In the city of Dallas and certain of its suburbs, trash collection service is performed by both the city and

private companies. In some of the Dallas suburbs, the municipality performs all trash collection. In still other suburbs all collection is carried out by a private company. The same type of variation apparently exists in the Houston area although the evidence about the Houston area is not as well developed.

Different kinds of equipment are used for different phases of trash collection service in both Dallas and Houston. The typical residential (private home) service is performed by collecting plastic bags, or emptying garbage cans. This is referred to as "hand" collection, because a man in the truck collects the bags or empties the cans by hand. There is also containerized collection. Commercial establishments (including apartments and apartment complexes) frequently accumulate trash in metal containers, which are periodically emptied into a truck by a mechanized process. Certain kinds of relatively large containers are not emptied into a truck, but are rolled onto a truck bed and carried to the disposal area where the containers are emptied.

The trucks into which containers are emptied at the customer's premises—and the types of containers used in this service—have a number of variations. The containers vary in size. The trucks vary according to whether they are loaded at the rear, the side, or the front. For obvious reasons, these trucks are referred to as "rear-load," "side-load" and "front-load." The containers which are hauled away to the disposal sites are called "roll-off" containers.

A large body of evidence has been introduced on the subject of the relevant line of commerce or product market, and voluminous briefing has been submitted. The difficulty is that, upon analysis of all these materials, it appears that neither the Government nor defendants have proposed realistic product market definitions.

As will be described in more detail later, it is reasonable to argue that the totality of trash collection services in a metropolitan area constitutes more than a single product market for § 7 purposes. Sound argu-ments can be made for differentiating residential collection from collection at commercial establishments (hereafter "commercial trash collection" or "commercial collection"), and for differentiating hand collection from containerized collection. For obvious reasons, there is a great deal of overlap between residential collection and hand collection, and between commercial collection and containerized collection. The activities of defendants' subsidiaries in Dallas and Houston (ACS, TIDI, Texas Waste, and Gulf Coast) are entirely in the commercial and containerized fields. It can be reasonably contended that the product market in which these companies are involved should be defined as either commercial trash collection or containerized trash collection.

It should be noted at this point that in the Dallas area, the former Waste Resources subsidiary TIDI is clearly the largest company in both commercial and containerized trash collection. It is equally clear that the Waste Management subsidiary ACS is the second largest company in both these fields. Their combined share of either the commercial market or the containerized market in the Dallas area is about 50%. To say the least, the Government has a strong case for defeating the merger in the Dallas area whether the product market is defined as commercial or containerized trash collection.

However, the evidence about the Houston area (and the lack of evidence) produces quite a different picture. There is no evidence which would permit the Court to find an excessive combined market share possessed by defendants' subsidiaries in the Houston area, in respect to either a commercial or a containerized product market.

Since the Government is attacking the merger in both Dallas and Houston, not surprisingly it has come up with product market definitions from which it attempts to argue the merger's illegality in both cities. In order to do this, the Government has chosen to propose product market definitions based upon certain types of trucks

and containers. The Government argues that there is a separate market for container collection performed by front-load trucks and another separate market for roll-off container collection. By these narrow market definitions the Government would win both its strong case in Dallas and its weak case in Houston.

The Government presents market share statistics for both the alleged front-load and roll-off markets in Dallas, but only for the alleged front-load market in Houston. Since the Government's market share statistics are so strong in Dallas (*i.e.*, TIDI and ACS are first and second in *both* "markets" and their combined market share is 50% or more in *both*) the differentiation of front-load collection from roll-off collection in Dallas is wholly irrelevant to whether the Government wins or loses as to Dallas. However, the singling-out of the front-load business in Houston is apparently needed to give the Government a product market in which it can argue a combined market share of sufficient size to violate § 7. In the Houston front-load "market" Texas Waste and Gulf Coast rank second and third and have a combined share of about 24%.

Turning to defendants' position on product market definition, defendants were obviously faced with the problem of upholding the merger in Dallas in face of very substantial market shares. The solution arrived at by defendants was to propose that the product market definition should be *all* trash collection services—including containerized and non-containerized, commercial and residential, and also including self-hauling and recycling. Defendants contend that, on the basis of this market definition, the Government has failed to show a violation of § 7 in either Dallas or Houston.

The relevant decisions make it clear that the court on a § 7 case is not bound by the market definitions of the parties, but may find markets in accordance with the evidence. *United States v. Continental Can Co.*, 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); *United States v. Manufactur-* *ers Hanover Trust Co.*, 240 F.Supp. 867, 911 (S.D.N.Y.1965). In the present case, the evidence does not support the product market definitions proposed by either the Government or defendants. The Government's attempt to define the market in terms of specific equipment breaks the market down too narrowly. Defendants' proposed definition is too broad.

The Court concludes that the appropriate product market definition for both Dallas and Houston is commercial trash collection—*i.e.*, trash collection from commercial establishments, including apartments and apartment complexes. As noted earlier, this market largely overlaps containerized trash collection. However, the evidence demonstrates that there is some degree of meaningful competition between hand collection and containerized collection for business at commercial establishments. Consequently, in the Court's view, commercial trash collection is the appropriate product market.

The Court also finds that the relevant product market includes commercial trash collection performed by both private companies and municipalities.

With regard to the question as to whether Fort Worth should be included in the Dallas area geographic market, the Court finds that it should not.

The Court concludes that the merger violates Clayton Act § 7 in respect to the Dallas area, but not as to the Houston area.

Further elaboration regarding the factual and legal issues is presented in the following material.

### Defendants' Revenues

Waste Management has its headquarters in Oak Brook, Illinois. Before the acquisition, Waste Management was, depending on the criteria used, either the nation's largest trash collection company, or the second largest. In 1980 Waste Management's revenues from trash service were $422 million.

EMW had its headquarters in New York City. EMW's subsidiary Waste Resources was the fourth largest trash disposal company in the United States, with trash service revenues in 1980 amounting to $54 million.

Waste Management's Dallas subsidiary, ACS, had 1980 revenues of about $8.2 million. As to the other subsidiary in the Dallas area, Texas Waste Management, the record does not contain revenue figures. However, it is apparently about ¼ the size of ACS. Waste Resources' Dallas subsidiary, TIDI, had 1980 revenues of about $9.6 million.

With regard to Houston, the 1980 revenues of the Waste Management Houston subsidiary, Texas Waste Systems, were $5.7 million. The 1980 revenues for the Waste Resources' Houston subsidiary, Gulf Coast Disposal, were $3.3 million.

### Dallas Geographic Market

The Government's proposed geographic market in the Dallas area consists of Dallas County (which contains the city of Dallas) plus a margin of 10 miles outside of the county—except that the 10-mile increment is not added on the west where Dallas County borders Tarrant County. Fort Worth is located in Tarrant County, and the Government takes the position that Fort Worth and Tarrant County belong in a different market from the market it proposes.

Defendants urge that Dallas and Fort Worth, and their environs, are one market. The center of Dallas is about 30 miles from the center of Fort Worth. The city of Dallas is surrounded, along most of its perimeter, by suburbs which are separate municipalities. The principal direction of growth for Dallas is to the north, including the cities of Farmers Branch, Carrollton, Richardson, and Garland. Farther out—ranging from the northwest to the northeast—are the cities of Coppell, Lewisville, The Colony, Plano, and Rowlett. Lewisville is in Denton County and Plano is in Collin County, but both these cities are within the Government's proposed market

area. To the east of Dallas is the city of Mesquite. To the south are the cities of Duncanville, Cedar Hill, De Soto, Lancaster and Hutchins. On the west—or Fort Worth side—of Dallas are the cities of Irving and Grand Prairie. Irving is in Dallas County. Grand Prairie is mostly in Dallas County, although it extends into Tarrant County. Farther to the west, bordered on one side by Grand Prairie and on the other side by Fort Worth, is the city of Arlington. Arlington is entirely in Tarrant County.

Within the limits of the city of Dallas, and entirely surrounded by that city, are the residential cities of Highland Park and University Park.

The Dallas-Fort Worth airport covers a sizable area straddling the line between Dallas County and Tarrant County.

■ The Government is correct insofar as it asserts that there is a market for trash collection centered in Dallas, which does not include Fort Worth. The actual boundary drawn by the Government is obviously for purposes of illustration. No one, including the Government, would imagine that this market has a fixed and definite boundary like that of a political subdivision. However, the evidence shows that there is a group of trash collectors which serves Dallas and its suburbs and that their activity diminishes to the vanishing point as the populous areas of Dallas and its environs turn into rural countryside. On the south and east this happens long before the Government's proposed market boundary is reached. On the north—the direction of greatest growth—the populous areas reach farther, but are generally well inside the Government's boundary.

On the west, in the direction of Fort Worth, it is true, as defendants contend, that Dallas-based trash collectors have done, and continue to do, some business across the Tarrant County line (the Government's proposed market border). For instance, Dallas companies have at times had the trash collection contract for the Dallas-Fort Worth airport. However, because the

area generally becomes somewhat rural before Fort Worth is reached, and because on both sides of the county line there are certain cities which give exclusive franchises to a Tarrant County trash collector, the activity of the Dallas collectors is greatly reduced by the time Tarrant County is reached. Moreover, the Dallas collectors as a rule do not do business in Fort Worth itself.

There is an abundance of evidence showing the rather local nature of the trash collection business, and further showing the distinctness of the Dallas and Fort Worth markets.

The business done by defendants' subsidiaries provides a vivid illustration. As already stated, the premerger situation was that Waste Management had two subsidiaries in the Dallas area—ACS in Dallas and Texas Waste Management in Lewisville; Waste Resources had a subsidiary in Dallas—TIDI.

Virtually all (99%) of the customer locations of ACS are in the Government's proposed market area. More than 80% are in the city of Dallas itself. Texas Waste Management's business is mainly in certain of the northerly suburbs of Dallas—Lewisville, Coppell, The Colony and Carrollton. There is no evidence of either ACS or Texas Waste Management doing business in Fort Worth, and any business done by these companies even in eastern Tarrant County is negligible.

In connection with TIDI, it has a sister company in Fort Worth—Material Control. The former parent corporation, Waste Resources, clearly regarded Dallas and Fort Worth as separate markets. There is testimony that at one time consideration was given to merging TIDI and Material Control, but the proposal was rejected since they were too far apart. The evidence is that both before and since the merger, the operations of TIDI and Material Control have been characteristic of companies operating in separate markets. With a few negligible exceptions, TIDI does all its business in the Government's proposed market area.

Another trash company with operations in Dallas and Fort Worth is named SCA. SCA has operations in many locations other than these two cities. The SCA Fort Worth facility at some point acquired a contract to do trash collection for a large customer in the Dallas area, Texas Instruments. After a short time SCA established a separate operation in the Dallas suburb, Garland. At the present time the SCA Fort Worth facility serves the Fort Worth area and the Garland facility serves the Dallas area.

The Government introduced evidence about other Dallas and Fort Worth trash collectors, and evidence about customers, proving that the Dallas collectors do not serve Fort Worth, and vice versa.

■ The Dallas area geographic market proposed by the Government is appropriate under the law as established by the governing authorities. *United States v. Marine Bancorporation*, 418 U.S. 602, 618–23, 94 S.Ct. 2856, 2868–2870, 41 L.Ed.2d 978 (1974); *United States v. Phillipsburg National Bank*, 399 U.S. 350, 362, 90 S.Ct. 2035, 2042, 26 L.Ed.2d 658 (1970); *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–339, 82 S.Ct. 1502, 1529–1531, 8 L.Ed.2d 510 (1962).

### Houston Geographic Market

■ The Government proposes that the geographic market in the Houston area should include Harris County (in which Houston is located) with an additional 10-mile margin outside the county border. There is no serious challenge to this. It is a reasonable definition of this geographic market.

### Dallas Product Market

The methods and organization of trash collection vary somewhat from area to area. With regard to Dallas and Houston, many of the features of trash collection service are similar in the two areas, although some features are different. The present discussion will concentrate on Dal-

las, although evidence relating to Houston will be referred to when relevant.

The two principal subsidiaries of defendants in Dallas, ACS and TIDI (excluding for the moment Texas Waste Management in Lewisville), are both engaged exclusively in commercial trash collection and do no business in residential trash collection. These two companies operate only containerized equipment and perform no hand collection service.

The distinction between commercial trash collection and residential trash collection is a distinction well understood in the trade in Dallas as well as in Houston. The witnesses at the trial referred to these two types of service constantly in their testimony.

Commercial trash collection relates to all kinds of commercial establishments, ranging from shops to factories; and also relates to apartments and apartment complexes. Residential collection relates to single family homes, and it probably also relates to small-size multiple family units. The line between commercial and residential, in the area of apartments and multiple family units, may lack precision. Nevertheless the basic distinction between the two types of service exists.

This point is reinforced when we examine the various municipalities in the Dallas area. By far the largest of these, of course, is the city of Dallas. It has a population of about 900,000.[1] Within its borders the city of Dallas collects all residential trash. Private companies, such as ACS and TIDI, operate in the city of Dallas and collect trash solely from commercial establishments, including apartments and apartment complexes. There is no competition between the private companies and the city of Dallas for the collection of the residential trash. Such collection is handled as a municipal service, and there is no evidence suggesting that the city is proposing to open residential trash collection to private companies. Residential trash collection in the city of Dallas is not part of the market in which the private companies compete.

Commercial trash collection in the city of Dallas is open to any company which can attract customers, as distinct from being given to a single company on the basis of an exclusive franchise as is done in some of the Dallas suburbs. Thus, in the city of Dallas the private companies sell their services directly to the customers and thus compete freely for commercial trash collection business.

The private companies performing commercial service in the city of Dallas do so entirely (or almost entirely) with containerized equipment. On the other hand, the city of Dallas does not offer any containerized trash collection service except to certain of its own municipal facilities. Thus the service offered by the city, except to such municipal facilities, is entirely hand collection. This is mainly residential trash collection, although the city also collects some commercial trash with its hand pickup service. With regard to commercial trash collection, the city of Dallas serves commercial establishments which, because of low volume or other circumstances, do not employ the containerized service of the private companies.

The extent of this commercial trash collection by the city of Dallas is a matter of dispute. The Government seeks to minimize it; defendants seek to maximize it. No witness from the city of Dallas was called by either side. Defendants' expert testified (without objection) that she had been told by employees of the city of Dallas that the city has revenues of about $3 million per year from commercial establishments. It appears that, in addition to businesses which generate only a small amount of trash, there are commercial entities, including downtown office buildings, which lack the space to utilize container service, and which set out plastic bags which are picked up by the city of Dallas.

On the question of whether there is competition between the containerized private operators and the city of Dallas for commercial trash collection business, it is clear

1. The population figures given in this opinion are from the 1980 census.

from the evidence that most commercial entities are rather firmly committed either to private service or to service by the city. The evidence about entities such as shopping centers, garden apartments and other businesses, which have ample space for containers and generate large amounts of trash, is that generally they prefer private container service to accumulating large quantities of plastic bags or garbage cans for collection by the city. In the case of a downtown office building which lacks the space for containers, the building would appear to have no ability to utilize containerized trash collection and must use the city. However, the record indicates that there is some meaningful shift back and forth by commercial customers between the city of Dallas and private companies, for various reasons. In the Court's view, it would be unrealistic not to recognize competition between the city of Dallas and the private companies for commercial trash collection business.

The Court concludes that ACS, TIDI and the other private companies compete in the commercial trash collection market. Although their service, which is containerized, constitutes the bulk of that market in the city of Dallas, there is some meaningful competition between these companies and the city in the commercial market. Residential trash collection is performed solely by the city of Dallas, and is a separate market in which the private companies do not compete.

The distinctness of the commercial and residential trash collection markets is carried forward in the Dallas suburbs, with some exceptions. There was reference at the trial to about 25 municipalities which are suburbs of Dallas, most of which were listed earlier in this opinion. Obviously they vary greatly in size—from Garland and Irving (pops. 139,000 and 110,000) to cities such as Coppell, Hutchins and Princeton, with populations under 5,000. In Garland and Irving the cities perform all residential trash collection service. There is no evidence of any competition between these cities and private companies for residential trash collection business. The situation as

to commercial trash collection in these cities is different. In Garland and Irving the cities compete with private companies for commercial business. It should be noted that this competition is somewhat different from what it is in the city of Dallas. Both Garland and Irving provide container service to commercial establishments. In both cities the type of container service offered is frontload. Apparently it is not easy for private companies to compete with the low rates offered by the cities. But the evidence demonstrates that such competition does exist; and to the extent it exists, the competition is *solely* with respect to the commercial trash collection market. Basically the same arrangement which exists in Garland and Irving, is also found in Farmers Branch (pop. 24,900), Carrollton (40,600) and Lancaster (14,800).

In the cities of Plano and De Soto (pops. 72,300 and 15,500), the city governments collect all residential trash. In each city a Dallas based company, Moore Industrial Disposal, has an exclusive franchise to provide containerized commercial service. The services offered by these cities appear to be solely hand collection. There is no evidence about the extent of competition, if any, for commercial trash business between Moore's containerized collection and the hand collection service offered by the cities. In any event, in these cities residential collection and commercial collection are treated distinctly.

However, in certain of the municipalities in the Dallas area, the same entity (either the city or a private company) handles both residential and commercial trash collection. In Richardson, Mesquite and University Park (72,500, 67,000 and 22,300), the cities perform all trash collection, both residential and commercial, with minor exceptions. Richardson and Mesquite offer both frontload and roll-off containerized service to commercial customers, and University Park offers side-load containerized service to such customers.

In some cities a private company is franchised to perform all trash collection ser-

vice, both residential and commercial. Grand Prairie and Duncanville (71,500 and 27,800) give such a franchise to J.C. Duncan Co., a company based in Tarrant County (city of Arlington). Waste Management's Lewisville subsidiary, Texas Waste Management, has franchises covering both residential and commercial service in Lewisville (24,300) and Coppell (3,800). Moore Industrial Disposal recently acquired such franchises in the small suburbs of Cedar Hill and Forney.

■ When the evidence about the city of Dallas and its suburbs is viewed as a whole, it is apparent that there are sufficient distinctions between commercial trash collection and residential trash collection so that they should be treated as two different product markets in the Dallas market area. The basic pattern is established by the largest municipality, the city of Dallas, and it is the dominant pattern in the surrounding cities.

This brings us to the question of who are the actors in this commercial trash collection market in the Dallas area. We start, of course, with the private companies, and this should include the activities of private companies both in municipalities where there is open competition and where a company has an exclusive franchise. Where a company has an exclusive franchise, this was obtained by competing with other companies and possibly with the municipality itself, and when the franchise expires, there will again be competition for that franchise among companies and possibly the municipality. The record makes it clear that competition for franchises is an important feature of the trash collection business in the Dallas area.

The earlier discussion about the city of Dallas makes it apparent that the commercial trash collection activities of the city government are to be included. By the same token, the commercial trash collection activities of the other municipalities which compete directly with the private companies are also part of the market.

Can the same be said for municipalities which collect all trash (including all commercial trash) themselves? As long as the city is the exclusive provider of service, no one can compete within that city. It is concluded that these cities are part of the market. The decision of a city to be the sole supplier of commercial trash service is a "competitive" decision in the sense of deciding to reject the available services of private companies. Moreover, the record shows that the private companies are continually seeking ways to break into the exclusive municipal service domains, and that such efforts occasionally succeed.

In ruling that the relevant product market is commercial trash collection, the Court rejects the Government's contention that there are separate markets or submarkets based upon the type of trucks and containers.[2]

Some further discussion of this issue is necessary. The Government contends that the proper method of defining the trash collection product markets in the Dallas and Houston areas is *solely* in terms of types of equipment. The Government contends that there are two markets involving containerized trash collection—front-load and roll-off. At oral argument the Government was asked what other markets there would be to cover the entire field of trash collection. The Government took the position that, in addition to the front-load and roll-off markets, there is a non-containerized market, and to the extent that rear-load and side-load container services are performed in Dallas and Houston, the Government takes the position that they are a single product market. Thus the Government's analysis is that there are four markets based upon types of equip-

**2.** As already stated, the Court also rejects the contention of defendants that the relevant product market is all trash collection, including both commercial and residential. One phase of the defense argument is that "self-haulers" and "recyclers" should be included in the product market. The Court finds no merit in the latter argument, based on the record in this case. In any event, there is no indication that the volume of self-hauling and re-cycling would have any significant effect upon the market share statistics in the present case.

ment, two of them involved in this case (Oral Argument Tr. 28).

With regard to Dallas, further analysis of the Government's position will be assisted by listing the private companies which the Government has included in its market share statistics for Dallas. The Government has introduced 1980 revenue figures for front-load service and roll-off service in the Dallas geographic market.

| Name | 1980 Revenues (thousands) | | |
| --- | --- | --- | --- |
| | Front-Load | Roll-off | Total |
| TIDI | $6,235 | $3,380 | $9,615 |
| ACS | 5,647 | 2,610 | 8,257 |
| Moore Industrial Disposal | 3,062 | 997 | 4,059 |
| Browning Ferris Industries | 1,552 | 1,071 | 2,623 |
| J. C. Duncan [3] | 802 | 469 | 1,271 |
| AIDS | 885 | 387 | 1,242 |
| Garland Disposal | 337 | 595 | 932 |
| Roll-Off | — | 497 | 497 |
| ABCO | 154 | 397 | 461 |
| United Disposal | 156 | — | 156 |
| Dallas Refuse | 95 | — | 95 |
| H & R Disposal | 85 | — | 85 |
| CSC | — | 16 | 16 |

For reasons which are not entirely clear, the Government did not include Waste Management's Lewisville subsidiary, Texas Waste Management, in the market share statistics, although Lewisville is located in the Government's proposed geographic market for the Dallas area. As already described, Texas Waste Management is about one-fourth the size of ACS, judging by the relative amount of equipment operated by each company. Texas Waste Management has front-load, side-load, rear-load and roll-off equipment.

From the evidence about these companies, the following facts emerge:

(1) Most of them perform commercial service only, although three companies—Moore, J.C. Duncan and Texas Waste Management—in addition to their commercial service, have franchises in certain municipalities for residential trash collection.

(2) The private companies performing commercial trash collection service in the Dallas area do so almost exclusively with containerized service. The suppliers of hand collection commercial service are municipalities (such as the city of Dallas). It may also be that the three companies having residential franchises in certain municipalities collect a certain amount of commercial trash along with the residential trash. However, no figures have been introduced as to the volume of such service, if it exists.

(3) The private companies offering containerized commercial trash collection service do so almost entirely with two types of equipment—front-load and roll-off. In the Dallas area, side-load and rear-load container services have been phased out by the private companies. The city of University Park (pop. 22,300) uses side-load containers in commercial trash collection. Otherwise, it appears that in the Dallas area side-load and rear-load trucks are used only for hand collection service, and this mainly by municipalities.

What has just been described leads to the following conclusions. In the first place, the Government's market share statistics, although purporting to relate to separate front-load and roll-off markets, in reality constitute figures showing the relative revenues of the private companies in the commercial trash collection market. As already stated, all these companies are in the commercial market, and their participation in this market is with their front-load and roll-off equipment. Thus their combined front-load and roll-off revenues (right-hand column) constitute their revenues in the commercial market.

The next—and most important—point in determining whether or not there are two separate front-load and roll-off markets is to observe how the business is organized. In this regard, the evidence demonstrates that it is viewed as essential by most of the

---

**3.** J.C. Duncan is based in the city of Arlington in Tarrant County. A substantial part of this company's revenues come from business in Tarrant County, outside the geographic market area pro-

posed by the Government and found by the Court. The $802,000 represents revenues obtained from business within the Dallas market area.

sizable companies to offer a full "line" of services—that is, both front-load and roll-off collection. Out of the 13 companies listed by the Government in its market share statistics, 8 of them offer both types of service. The top 7 companies do so, as does another substantial company, 9th-ranking ABCO. The president of one of the companies which offers front-load service only—United Disposal—testified that he is at a serious disadvantage by not offering roll-off service; he views his company as "a one-half trash company." Similar testimony was given by the operator of a Houston front-load company, Trash, Inc.

If we turn from the private companies to the municipalities which offer commercial container service, the following are the facts regarding the type of service offered. Both front-load and roll-off collection is offered by Richardson, Mesquite, Carrollton and Farmers Branch. Front-load service only is offered by Garland, Irving, Lancaster and Lake Dallas. The latter is a small town (pop. under 5,000) on the northwest fringe of the Dallas market area. The relevant 1980 revenue figures (in thousands) are:

| City | Front-Load | Roll-Off | Total |
| --- | --- | --- | --- |
| Irving | $804 | — | $804 |
| Mesquite | 560 | $240 | 800 |
| Richardson | 588 | 161 | 749 |
| Carrollton | 600 | 120 | 720 |
| Garland | 667 | — | 667 |
| Farmers Branch | 371 | 70 | 441 |
| Lancaster | 93 | — | 93 |
| Lake Dallas | 36 | — | 36 |

The conclusion from the evidence is that the great bulk of trash collection business done in the Dallas area by private companies is carried out by entities which organize themselves to offer two complimentary lines of service—front-load and roll-off. In the case of municipalities which offer container service, the bulk of such service is performed by municipalities offering both front-load and roll-off collection. Although front-load and roll-off services differ in various respects, their essential features are common. Both types of service involve the collection of trash, which has been accumulated in metal boxes, and which must be moved by trucks from the customer's location to a disposal site.

The Government has introduced a great deal of evidence about the differences between front-load service and roll-off service, and the difference between each of these types of service and still other forms, such as side-load and rear-load, containerized and non-containerized. The basic facts are not in dispute.

Front-load and roll-off services are solely containerized. Side-load and rear-load services can be either containerized or hand collection.

Standard trash collection receptacles range all the way from a plastic bag or garbage can (for hand collection) to containers the size of large trucks. A normal home-type garbage can or plastic bag contains about 30 gallons. Containers are referred to by their cubic yard capacity. They range from 1 yard to 50 yards. One cubic yard is equal to 200 gallons. Thus a 1 yard container has the capacity of 6⅔ standard plastic bags or garbage cans. The containers which are emptied into side-load, rear-load, or front-load trucks are the familiar "dumpster" containers. They range from 1 yard to 8 yards. The sizes of roll-of containers run from 10 yards to 50 yards.

Side-load trucks are generally limited to relatively small containers—1 or 2 yards. Rear-load trucks can handle containers up to 8 yards, but the most common size used with these trucks is 4 yards. Front-load containers range from 2 to 8 yards, the most common size being 6 yards.

With regard to the three types of trucks handling dumpster containers, each has its advantages and disadvantages, depending on a variety of factors. If trash is picked up in narrow alleys (as in University Park, a city surrounded by Dallas), side-load trucks are desirable. As between rear-load and front-load trucks, the rear-load trucks are generally less expensive to purchase, but their use requires more labor, since one or two men must get out of the truck to assist in the emptying of the container, if the truck is being used in a container oper-

**510**

ation. A front-load truck can pick up containers with a mechanical device operated by the truck driver, thereby saving labor. On the other hand, there must be the proper space for this operation; and such space is not always available, as in downtown locations.

For obvious reasons having to do with the amount of space available in shopping centers, garden apartments, and also having to do with the labor-saving factor, container operations in the Dallas area today are almost entirely front-load and roll-off. Side-load and rear-load container operations have been almost entirely phased out, with the exception of the side-load service offered by the city of University Park.

Front-load container service is obviously used by many different types of commercial establishments—stores, restaurants, office buildings, filling stations, apartments, factories. This manifests itself in widely different demands as far as volume. The Government's principal witness, Michael Moore of Moore Industrial Disposal, testified that his company provides front-load service to customers with volumes ranging from 6 yards to 300 yards per month. His average front-load customer has 40 yards per month.

Roll-off containers have a variety of uses. They are commonly used for the handling of debris at construction or renovation sites. In addition to the factor of high volume, this kind of debris is "noncompactible," in contrast to the trash which is placed in the dumpster containers and then compacted within a side-load, rear-load or front-load truck. Another use for roll-off containers is to collect ordinary compactible trash in large volume. Sometimes the customer has a compacter on the premises, which will condense trash for placement in a roll-off container.

The Government has introduced a large body of evidence to show the lack of interchangeability between front-load and roll-off service, and these and other forms of service involving different equipment. The Government relies on the numerous cases, starting with *Brown Shoe v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), which make interchangeability of use a prime factor to be considered in determining whether two or more products are in the same market. The Court agrees with much of the factual argument presented by the Government, although the Court rejects the conclusions proposed.

A small tailoring shop, which generates a few bags of trash per week, will probably have no use for container service of any kind. A restaurant of modest size may find it convenient to use dumpster container service, to avoid the accumulation of numerous bags or garbage cans, but could well find it impossible to use a large roll-off container. A factory generating a very large amount of trash could well find both trash bags and dumpster containers wholly unsuitable to its needs.

But the Government's argument proves too much. Product market definitions based on customer commitment to various kinds of service would produce markets more fragmented than the ones suggested by the Government. A customer who uses a 4-yard container will undoubtedly state that he cannot possibly utilize an 8-yard container, although both are dumpster containers and can be handled by front-load trucks. There are great differences in size among roll-off containers. The construction company which uses 40-yard roll-off containers at building sites would surely say that a group of 10-yard containers would be unacceptable. The construction company, which collects non-compactible debris, would also have no use for another distinct type of roll-off service involving an on-premises compacter and accumulation of the compacted trash in a roll-off container.

At the same time, there is no bright line between front-load and roll-off service. An 8-yard front-load container is obviously not much different from a 10-yard roll-off container. Both are simply metal boxes for the collection of trash. Also, a customer may generate a high enough volume such that roll-off service might be used, but

space limitations may require the use of dumpster containers.

◼ The conclusion to be drawn from the evidence about equipment is that there are various types and sizes of equipment, which serve a variety of different needs. However, these differences are not the appropriate way to distinguish product markets in the trash collection business—at least in the Dallas and Houston areas. As to one important factor, volume, there is a continuum running from small to large, in somewhat the same way as there is in sizes of shoes and clothing. Although different equipment may be needed to handle different volumes of trash collection, there is no reason to say that volume *per se* defines a particular market. In the Dallas area, the companies in the trash business have generally organized themselves to have equipment (both front-load and roll-off) which will handle the full range of service and volume needs for commercial customers. The Government witness, Michael Moore, testified that his company, by offering both front-load and roll-off collection, serves customers generating as little as 6 yards per month all the way to as much as 600 yards or more per month.

Defendants' Dallas subsidiaries, TIDI and ACS, offer this full range of commercial trash collection services with their front-load and roll-off equipment. They compete with each other in offering this range of services, and they compete with other companies in the Dallas area, among which the prevailing pattern is to provide both front-load and roll-off collection.

Certain leading decisions have held that where business is organized to group together various services or products, this circumstance may make it appropriate to consider them as a single product market, rather than as separate markets, where this reflects the "commercial realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572–573, 86 S.Ct. 1698, 1704–1705, 16 L.Ed.2d 778 (1966); *United States v. Philadelphia National Bank*, 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963); *In the Matter of British Oxygen Co. Ltd.*, 86 F.T.C. 1241, 1344–47, 1368–70 (1975). These authorities apply to the present case. Front-load and roll-off services should be treated as part of the same commercial trash collection market in the Dallas area.

### Lessening of Competition in Dallas

As stated earlier, the actors in the commercial trash collection market in Dallas are the private companies (including service to individual customers and service pursuant to municipal franchises) and municipalities which offer commercial service. The Government has not attempted to introduce evidence which specifically addresses market shares in a product market defined as commercial trash collection. The Government's market share statistics for Dallas relate to the alleged front-load and roll-off markets. However, as previously described, it is the Court's conclusion that, in respect to the private companies, the combined front-load and roll-off revenues represent the revenues of these companies in the commercial trash collection market. Revenues of municipalities in front-load and roll-off service also relate to the commercial trash collection market. This leaves the question of revenues of municipalities from hand pick-up service in commercial trash collection. The principal participant in such activity is the city of Dallas. The only evidence about the relevant Dallas revenues is the hearsay testimony (referred to earlier, received without objection) giving the figure of $3 million. For lack of any better evidence, this figure will be used in the market share statistics. There is no evidence about the volume of the side-load container service provided to commercial establishments by the city of University Park (pop. 22,300), nor is there evidence about the hand collection commercial service in cities other than Dallas. However, it can be safely assumed that the absence of such data does not significantly affect the conclusions to be drawn about the market shares of defendants' subsidiaries in the Dallas area. It should also be noted that there are no figures for Waste Management's Lewisville subsidiary, Texas

Waste Management, none having been introduced into evidence. However, if such figures were included this would only result in the market shares of defendants' subsidiaries being slightly higher than what is shown.

The following tabulation lists the participants in the commercial trash collection market in the Dallas area and their 1980 revenues from such activities based upon the evidence described above:

| Company or Municipality | 1980 Revenues (thousands) | % |
|---|---|---|
| TIDI | 9,615 | 26.3 |
| ACS | 8,257 | 22.5 |
| Moore | 4,059 | 11.1 |
| City of Dallas | 3,000 | 8.2 |
| Browning-Ferris | 2,623 | 7.2 |
| Duncan | 1,271 | 3.5 |
| AIDS | 1,242 | 3.4 |
| Garland Disposal | 932 | 2.5 |
| City of Irving | 804 | 2.2 |
| City of Mesquite | 800 | 2.2 |
| City of Richardson | 749 | 2.0 |
| City of Carrollton | 720 | 2.0 |
| City of Garland | 667 | 1.8 |
| Roll-Off | 497 | 1.3 |
| ABCO | 461 | 1.3 |
| City of Farmer's Branch | 441 | 1.2 |
| Six Others | 481 | 1.3 |
| | 36,619 | 100.0 |

■ The combined share of TIDI and ACS (the first and second ranking providers of commercial trash collection service) is 48.8%. The top four providers before the merger have 68.1% of the market. The top four providers after the merger have 75.2% of the market.

This market share data brings the case within the rule established by the Supreme Court that certain market concentration ratios will make a merger "prima facie" or "presumptively" illegal under Clayton Act § 7, shifting the burden to the defense to justify the merger. *United States v. Philadelphia National Bank*, 374 U.S. 321, 364–366, 83 S.Ct. 1715, 1742–1743, 10 L.Ed.2d 915 (1963); *United States v. Continental Can Co.*, 378 U.S. 441, 461, 84 S.Ct. 1738, 1749, 12 L.Ed.2d 953 (1964); *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Citizens &*

*Southern National Bank*, 422 U.S. 86, 120, 95 S.Ct. 2099, 2118, 45 L.Ed.2d 41 (1975).

A finding of prima facie or presumptive illegality is compelled by the market share data for Dallas in the present case. The combined market share of the merged companies, and the degree of concentration in the hands of these and other large providers of service, present an even stronger case of "undue concentration" than in the leading cases where § 7 violations have been found. For instance, the combined shares of the merged entities in *Philadelphia National Bank* and *Continental Can* were 30% and 25% respectively.

■ A defendant may rebut a prima facie case of § 7 illegality by showing that the market share statistics do not reflect the realities of the market. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), where the defense demonstrated that the Government's statistics were significant largely with respect to past market conditions, and were not meaningful as to the effects of the acquisition in question upon future competition. However, it should be noted that the *General Dynamics* opinion specifically states that in most situations it is reasonable to infer that competitive strength in the recent past is a satisfactory indication of future performance. 415 U.S. at 501, 94 S.Ct. at 1195.

Defendants in the present case urge that even if the Government has made a prima facie showing on the basis of market share statistics, there are circumstances which undermine the significance of these statistics. Among the arguments in this regard are:

(1) It is so easy to enter the trash collection market that the relative competitive strength of a company cannot properly be measured solely with respect to the existing companies in the market, but must take into account potential new entrants.

(2) Over the past several years there has been a trend toward deconcentration,

involving steady entry into the market by new companies.

(3) Municipal regulation is a check on the ability of the companies to raise prices or reduce the quality of service.

On the first and second points, the Court agrees that entry into the trash collection business is relatively easy, and the barriers to entry not great. A person wanting to start in the trash collection business can acquire a truck, a few containers, drive the truck himself, and operate out of his home. A great deal depends on the individual's personal initiative, and whether he has the desire and energy to perform a high quality of service. If he measures up well by these standards, he can compete successfully with any other company for a portion of the trade, even though a small portion. If he does not measure up, he is less successful or fails.

Over the last 10 years or so a number of companies have started in the commercial trash collection business, performing containerized service. A few, including TIDI and ACS, have grown to substantial size, presumably because of good management and service, and also as a result of acquiring other companies. The majority of new entrants have either remained relatively small or disappeared as independent entities by going out of business or being acquired by larger companies.

■ There is no showing of any circumstance, related to ease of entry or the trend of the business, which promises in and of itself to materially erode the competitive strength of TIDI and ACS. With regard to the legal effect of low entry barriers and potential competition in a § 7 case, there is no persuasive authority for allowing such factors to overcome a strong prima facie showing of concentration in the *existing* competitive structure. 4 Von Kalinowski, *Antitrust Laws and Trade Regulation* 19–66 (1982). *See Ekco Products Co.*, C.C.H. Trade Reg.Rep. ¶ 16,879 (p. 21,895) (F.T.C. 1964), *aff'd*, 347 F.2d 745 (7th Cir.1965).

■ In regard to the third point described above, it is true that trash collection, having a close relation to city sanitation, is subject to municipal regulation. However, there is no merit in the contention that this circumstance defeats the Government's prima facie showing of illegality.

■ The conclusion is that defendants' merger has the effect of substantially lessening competition in the commercial trash collection market in the Dallas area, and is thus illegal under Clayton Act § 7.

*Product Market in Houston Area*

■ The evidence about Houston is, in many respects, less developed than the evidence about Dallas. However, the evidence justifies the same conclusion about product market in Houston as in Dallas— that there are two different markets, commercial trash collection and residential trash collection.

The city of Houston has a population of about 1,750,000. The city collects residential trash, and also a very limited amount of commercial trash. There is an ordinance which specifies that a commercial establishment can set out no more than two garbage cans or sacks on each pick-up day (which is twice a week). Within the city of Houston there are civic associations which are permitted to hire their own haulers of residential trash. These arrangements take the form of "sponsorship agreements" between the associations and the city. Where the sponsorship agreements apply, the city of Houston refrains from collecting, and the collection is done by the firms hired by the civic associations. There is no evidence that the companies discussed by the Government in connection with its Houston case participate in any of the residential trash collection activities in the city of Houston. There is a separate commercial trash collection market in which defendants' Houston subsidiaries, Texas Waste Systems and Gulf Coast Disposal, compete with various other private companies.

The suburbs of Houston, such as Pasadena and Baytown, follow the pattern of collecting residential trash and having private companies collect commercial trash, either

by open competition or by franchise. A Government witness stated that most of the municipalities in the area handle trash collection in this manner.

Texas Waste and Gulf Coast perform containerized commercial service only, with front-load and roll-off equipment. These are the second and third largest trash companies in the Houston area. The first ranking company, Browning-Ferris Industries, has both front-load and roll-off equipment, and presumably does most of its business in the commercial field, although whether it has any residential business is not clear.

As to type of equipment used in the Houston area commercial trash collection market, the picture is more mixed than in Dallas. There are companies (mainly small in size but apparently numerous) which make use of containerized side-load and rear-load equipment, in contrast to Dallas, where this equipment has been largely phased out. Nevertheless, the bulk of the container service in the Houston area appears to be front-load and roll-off.

For the same reasons which pertain to Dallas, the Court concludes that it is inappropriate in Houston to find product markets based on types of equipment. Although there is no systematic presentation regarding the equipment lines used by the Houston companies, it is at least clear that the six largest companies listed by the Government as being in the alleged front-load market also offer roll-off service. Thus they are organized to offer a full range of commercial trash collection services with these two kinds of equipment.

### No § 7 Violation In The Houston Area

■ The Government has introduced no evidence which would justify any finding about the market shares of defendants' subsidiaries in the commercial trash collection market in the Houston area. The only market share data submitted by the Government for Houston is for an alleged front-load market, in which defendants' subsidiaries are said to have a 14.9% share (Texas Waste) and a 9.2% share (Gulf Coast) or a combined share of about 24%.

No market share data is submitted about roll-off service. No data is submitted about other phases of commercial trash collection in Houston involving rear-load, side-load and hand collection service.

For these reasons the Government has failed to show a violation of Clayton Act § 7 in the Houston area market.

### The Remedy

■ The Government argues that Waste Management should be ordered to make full divestiture of Waste Resources. Alternatively the Government contends that there should be partial divestiture in respect to any area where illegality is found. Under the rulings which have been made, this would mean that Waste Management would be required to divest itself of TIDI.

Defendants contend, that if the question of remedy is reached, there should be some sanction short of divestiture, either full or partial.

In the view of the Court, it would be inappropriate to order total divestiture of Waste Resources. No illegality has been claimed in any location other than Dallas and Houston, and a violation has been found by the Court only in Dallas.

Divestiture by Waste Management of its acquired subsidiary in Dallas, TIDI, is the proper remedy.

### Conclusion

For the foregoing reasons it is determined that the acquisition of defendant EMW Ventures Incorporated by defendant Waste Management, Inc. violates § 7 of the Clayton Act, 15 U.S.C. § 18, in respect to the Dallas market area, but not in respect to the Houston market area. Defendant Waste Management, Inc. will be directed to take appropriate steps to divest itself of the acquired Dallas subsidiary, TIDI.

The Government should submit an appropriate judgment on notice to defendants.

So ordered.